UNITED STATES of America,
Plaintiff–Appellee,

v.

Antonio Luis BURGOS, Defendant–
Appellant.

No. 94–5300.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 4, 1994.

Decided June 1, 1995.

**ARGUED:** Allan Bethea Burnside, Asst. Federal Public Defender, Columbia, SC, for appellant. David Jarlath Slattery, Asst. U.S. Atty., Columbia, SC, for appellee. **ON BRIEF:** J. Preston Strom, Jr., U.S. Atty., Columbia, SC, for appellee.

Before ERVIN, Chief Judge, RUSSELL, Circuit Judge, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge RUSSELL and Senior Judge MacKENZIE joined.

## OPINION

ERVIN, Chief Judge:

Antonio Luis Burgos appeals his conviction for conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846. Burgos levels two criticisms against the district court, the more substantial of which challenges the propriety of the *Allen* charge issued to a deadlocked jury. Because we find that the district court failed to provide a sufficiently balanced *Allen* charge, admonishing *both* the majority and minority to take each other's positions into account, we reverse Burgos' conviction and remand the case to the district court for a new trial.

### I.

In May 1993, Sumter, South Carolina postal authorities notified Postal Inspector James McDonald of a suspicious package addressed to John Pringle that had arrived from New York. McDonald obtained a search warrant and discovered that the package contained cocaine base. McDonald began checking postal records to determine whether other packages had been mailed to Pringle from the same address. The inspector learned that between March 27 and May 15, 1993 five other packages had been sent either to Pringle or to Matthew Mack from a particular Brooklyn, New York address. McDonald interviewed Mack on two occasions, and during the second interview Mack stated that an individual known as Celo, who was from New York City, had been arranging drug transactions from his hometown. Prior to this meeting with Inspector McDonald, Mack had known Celo—whose real name was Anthony Burgos—for several months. Burgos had served as Mack's supplier of cocaine throughout 1993. Mack admitted to receiving packages of cocaine for Burgos and to sending cash to other New York suppliers at Burgos' request.

Pringle knew Burgos even better than Mack did. In fact, Pringle claimed that he had known Burgos for three to five years and that they had lived in the same neighborhood for part of that time. Pringle also knew that Burgos went by the nickname Celo. Pringle testified that Burgos sold drugs for a living. Additionally, Pringle testified that he occasionally purchased crack cocaine from Burgos for resale or sent money to New York on Burgos' behalf.

The government also had the benefit of testimony from two other people who knew Burgos personally. Nancy Colclough and Doretha Pringle, John Pringle's mother and sister, respectively, learned of Burgos' involvement with drugs sometime in April 1993 when Colclough picked up a mysterious package from the post office that had been addressed to her son, John. The package arrived from New York, and believing that her son did not know anyone in New York, Colclough opened the package in the presence of her daughter, Doretha. Doretha testified that inside the box was a bag full of powder that she and her mother believed to be cocaine. Very upset, Colclough contacted her son at Mack's house. Within minutes, Pringle appeared at his mother's house with Burgos, who apologized to Colclough for having had the package delivered to her home. Burgos claimed that the package was supposed to have gone to another address in Sumter. In an effort to make amends with Colclough, Burgos sent $100 to her later that day. Importantly, both Colclough and Doretha Pringle testified at trial that they had known Burgos from the neighborhood for at least two months by the time he visited their house in April 1993.

In May or June of 1993, Postal Inspector McDonald showed a photo spread to John Pringle, Mack, Colclough and Doretha Pringle. Burgos is Hispanic, and the photos displayed were of him and seven African–American men. All four of the eventual witnesses picked Burgos' picture from the display as the man they knew to be "Celo." None of the witnesses were reshown the photographs prior to trial, which did not take place until March 1994. Each identified Burgos during the trial without reference to the photos.

On November 16, 1993, a grand jury returned a two-count indictment against Burgos, charging him with conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846, and possession with intent to distribute more than fifty grams of cocaine base under 21 U.S.C. § 841(a)(1). The court empaneled a jury on January 10, 1994, and three days later the government learned for the first time that postal authorities had prepared a photo lineup during the course of their investigation. The government immediately provided defense counsel with a copy of the photo display from which the four witnesses had originally identified Burgos. On January 14, Burgos moved to suppress the witnesses' in-court identifications of him, claiming that any such identification would be impermissibly biased as a result of the witnesses' earlier consideration of the overly suggestive photo lineup. The government made it clear to the court and to defense counsel that it had no intention of using the photo display during the trial. Trial began four days later without an evidentiary hearing on Burgos' motion.

The jurors began their deliberations on January 19, 1994. After four hours, the jury informed the district court that it could not reach a verdict. On its own motion, the court then issued an *Allen* charge, in an effort to help the jury overcome the deadlock. The defendant subsequently objected to the *Allen* charge. The jury did not reconvene for further deliberations until January 21, when it met for approximately two hours before returning a verdict of guilty on the § 846 conspiracy charge. Two months later, Burgos was sentenced to 210 months in prison. This timely appeal followed.

## II.

Burgos challenges the propriety of the instructions issued to the deadlocked jury. "Both the decision to give (or not to give) a jury instruction and the content of an instruction are reviewed for abuse of discretion." *United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993); *Carter v. Burch,* 34 F.3d 257, 264 (4th Cir.1994) (applying abuse of discretion standard in *Allen* charge context), *cert. denied,* — U.S. —, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995).

An *Allen* charge, based on the Supreme Court's decision in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is "[a]n instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's

argument." *United States v. Seeright,* 978 F.2d 842, 845 n. * (4th Cir.1992) (quoting BLACK'S LAW DICTIONARY 74 (6th ed. 1990)). Traditionally, the standard *Allen* charge informed the jury (1) that a new trial would be expensive for both sides; (2) that there is no reason to believe that another jury would do a better job; (3) that it is important that a unanimous verdict be reached; and (4) that jurors in the minority should consider whether the majority's position is correct. *Russell,* 971 F.2d at 1107 n. 18. The particular phrasing of the *Allen* instructions has been the subject of "considerable criticism" throughout the federal circuits over the past twenty-five years. *See United States v. Mitchell,* 720 F.2d 370, 371 (4th Cir.1983); *United States v. Dorsey,* 865 F.2d 1275, 1278 (D.C.Cir.) (holding that trial judges in D.C. Circuit are required to use charge patterned on American Bar Association standard rather than the "problematic" *Allen* charge), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 603 (1989); *United States v. Graham,* 758 F.2d 879, 883 (3d Cir.) (restating circuit's previous rejection of *Allen* charge), *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 227, 88 L.Ed.2d 226, 227 (1985). The fourth component of the standard *Allen* charge, in particular, engendered debate in this circuit and led to our suggested modification of the charge in *United States v. Sawyers,* 423 F.2d 1335 (4th Cir.1970), and *United States v. Stollings,* 501 F.2d 954 (4th Cir.1974).

■ At the heart of our *Allen* charge jurisprudence is the basic principle that a defendant has "the right to have the jury speak without being coerced." *Sawyers,* 423 F.2d at 1341. This court has upheld *Allen* charges as long as the instructions contained

therein were "fair, neutral, and balanced." *Carter,* 34 F.3d at 264; *cf. Sawyers,* 423 F.2d at 1339 (holding that the supplemental charges "were not so coercive as to impair the integrity of the verdicts"). In the traditional *Allen* charge, one of the most likely sources of coercion is rooted in the court's admonition to the jury that members of the minority reconsider the position taken by those in the majority. *Compare Sawyers,* 423 F.2d at 1340 (charge upheld because we found "[t]here was not the slightest intimation of impatience with the minority, nor any words that could be construed as a threat or even an expression of displeasure"), *with Mitchell,* 720 F.2d at 372 (reversing conviction and remanding for retrial based, in part, on language in *Allen* charge that the jurors should "open up [their mind] and reevaluate [their] opinions ... reconsider the opinions and statements of your fellow jurors, and do it open-mindedly, not *stubbornly,* but open-mindedly *in the spirit of cooperation ...*").

Although *Sawyers* upheld the district court's instruction to the deadlocked jury,[1] this court expressed a preference for a more balanced charge—one that would specifically admonish "the majority to listen and consider any minority viewpoint." *Sawyers,* 423 F.2d at 1342. Use of the pure *Allen* charge, which only imposes a duty on those jurors in the minority to reconsider their position, would not constitute *"per se* reversible error," *id.* at 1343; yet, *Sawyers* "strongly recommend[ed]" a modified charge that included explicit instructions to both majority and minority members of the jury. *Id.* As an example of a balanced *Allen* charge, we offered the set of instructions created by the Judicial Conference of the United States

---

1. The district court in *Sawyers* provided rather detailed instructions to the jury without drawing such a sharp distinction between the majority and minority. As part of its fairly lengthy charge, the district court advised:

 If much the greater number of you are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors, who bear the same responsibility, serve under the sanction of the same oath, and have heard the

same evidence with, we may assume, the same attention and a [sic] equal desire to arrive at the truth. On the other hand, if a majority or even a lesser number of you are for acquittal, other jurors ought to seriously ask themselves again whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellow jurors, and whether they should not distrust the weight or sufficiency of evidence which fails to convince the minds of several of their fellows to a moral certainty and beyond a reasonable doubt.

 *Sawyers,* 423 F.2d at 1338 n. 4.

Courts. The most important portion of this instruction stated "that each juror who finds himself in the minority shall reconsider his views in the light of the opinions of the majority, and each juror who finds himself in the majority shall give equal consideration to the views of the minority." *Id.* at 1342 n. 7 (quoting SUPPLEMENT TO REPORT OF THE COMMITTEE ON THE OPERATION OF THE JURY SYSTEM OF THE JUDICIAL CONFERENCE OF THE UNITED STATES 2 (1969)).

The move towards a more balanced *Allen* charge was gradual, and it was not until four years after *Sawyers* that we reemphasized our desire for *Allen* charges to include instructions both to the minority and majority factions of a jury. *Stollings,* 501 F.2d at 955–56. In *Stollings,* we came even closer to adopting the Judicial Conference's recommendations as Fourth Circuit law, holding that "if the Allen charge is used, it should be used in a form no stronger or less balanced than the form prescribed in *Sawyers.*" *Id.* at

956. *Sawyers'* "strong recommendation" nearly became a mandate in *Stollings,* in which the court concluded that "we shall feel free to treat the giving of the Allen charge, in a form other than that we have repeatedly suggested, as reversible error if we deem it appropriate so to do." [2] *Id.; see also United States v. West,* 877 F.2d 281, 291 (4th Cir.) (referring to the progression from *Sawyers* to *Stollings* as a move from a "recommendation" to an "admonition"), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989).

What has emerged from *Sawyers* and *Stollings* is a simple rule: it is strongly recommended that "the majority and minority on a deadlocked jury be instructed to give equal consideration to each other's views." *West,* 877 F.2d at 291.[3] A tension exists, however, between the rather clear dictates of *Sawyers* and *Stollings,* on the one hand, and the reality that the Fourth Circuit has "[n]ever reversed a conviction on the grounds that the district court failed to give the modi-

---

**2.** Although *Sawyers* and *Stollings* moved this court substantially towards requiring more balanced *Allen* charges, neither of those decisions resulted in reversals of the defendants' convictions. According to *Stollings,* the only reason the lower court's charge was permitted to stand was that at the time of trial, the Fourth Circuit had not yet announced its two post-*Sawyers* decisions of *United States v. Davis,* 481 F.2d 425 (4th Cir.) (reiterating recommendation of *Sawyers* to use modified *Allen* charge), *cert. denied,* 414 U.S. 977, 94 S.Ct. 296, 38 L.Ed.2d 220 (1973), and *United States v. Hogan,* 486 F.2d 222, 223 (4th Cir.1973) (same), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). Had Stollings been tried after our decisions in *Davis* and *Hogan,* every indication given by the *Stollings* court is that the defendant's conviction would have been reversed. *Stollings,* 501 F.2d at 956.

In light of the *Stollings* court's overriding concern for guarding against coercion of jurors in the minority, it is fairly easy to determine which portion of the charge issued in that case was the most suspect. After using much of the same language found in the charge issued by the *Sawyers* court, the trial judge in *Stollings* went on to state: "A juror should listen with deference to the arguments and with a distrust of his own judgment if he finds a large majority of the jury taking a different view of the case from what he does himself." *Id.* at 955–56 n. 1.

**3.** Our sister circuits have embraced similar modifications of the pure *Allen* charge. *See, e.g., United States v. Clark,* 988 F.2d 1459, 1468 (6th

Cir.) (upholding *Allen* charge that reminded each juror, "whether you are in the majority or the minority ... to seriously reconsider your position in light of the fact that other jurors who are as conscientious and just as impartial as you are have come to a different conclusion"), *cert. denied,* —— U.S. ——, 114 S.Ct. 105, 126 L.Ed.2d 71 (1993); *United States v. Straach,* 987 F.2d 232, 242–43 (5th Cir.1993) (modified *Allen* charge appropriate where judge's instruction did not coerce jurors in the minority to surrender their views to those in the majority); *United States v. Cortez,* 935 F.2d 135, 140 n. 5 (8th Cir.1991) (applying modified *Allen* charge directed at individual juror, who is not to surrender "honest convictions," rather than at collective jury), *cert. denied,* 502 U.S. 1062, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992); *United States v. West,* 898 F.2d 1493, 1500–01 (11th Cir.1990) (issuing of "modified, modified *Allen* charge" upheld where there was no instruction to the minority to defer to the majority or an implication that the majority was correct), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 676 (1991); *United States v. Smith,* 857 F.2d 682, 684 n. 4 (10th Cir.1988) (citing with approval Third Circuit's "Aldisert charge" which "calls upon every juror to reflect upon the correctness of his preliminary appraisal of the evidence, not just the minority"); *United States v. Nichols,* 820 F.2d 508, 511–12 (1st Cir.1987) (modified *Allen* charge included specific reminder that "not only should jurors in the minority reexamine their positions, but jurors in the majority should also do so").

fied charge."[4] *Russell,* 971 F.2d at 1107 n. 19. On those occasions in which *Allen* charges have met with our approval in the past, however, the instructions have targeted both the majority and minority of a jury. *See, e.g., Carter,* 34 F.3d at 264 n. 3 (upholding charge which included statement that "the minority ought to ask themselves whether they may not reasonably question the correctness of a judgment which is not concurred in by the majority, provided, of course, that each juror who finds himself in the majority shall listen and give consideration to the views of the minority"); *United States v. Martin,* 756 F.2d 323, 325 (4th Cir.1985) (en banc) (including as part of *Allen* charge that "if you are in the minority on the Jury, listen to the views of the majority; and if you're on the majority on the Jury, you listen to the views of the minority"); *cf. West,* 877 F.2d at 290 n. 6. (offering an *Allen* charge substantially similar to the one offered in *Sawyers,* yet adding that "no juror is expected to [sur]render a conscientious conviction he or she may have as to the weight or effect of the evidence").[5]

Burgos' case finally presents us with an *Allen* charge, the questionable elements of which, strike at the very heart of *Sawyers'* concerns. The often meandering, somewhat confusing charge given by the district court provides in its entirety:

I have observed you during the course of the trial. It has not been a lengthy trial. I believe that this jury is comprised of very intelligent and very dedicated people. And I don't believe we are going to find a jury better equipped than you to decide this matter.

If you don't decide it, then, of course, we have got to convene another 12 persons. And I tell you, I don't believe there are another 12 people who exceed you in intelligence and the ability to decide this case.

Now, you have not had it long. You have had it since 12:30 today. You had your lunch brought in. It is now 5:25 by this clock. That clock is a little fast. That's not an awfully long period of time.

There's a jury out in California that as of last night the last time I heard they had the case—their case nearly three weeks.

We have had juries in this building to deliberate for several days. So it is not unusual for the jury after a few hours in a case that's considered close—I don't know whether—I don't know how close you view the case—but we have had juries who were not able to see the case exactly alike.

There is, of course, a duty on jurors to review the evidence, to deliberate with each other to consider the reasonable view of others.

You know, *it is not easy to back away from an opinion that has earlier been expressed. If I have taken a possession [sic] [position] amongst a group of people, sometimes my pride doesn't allow me to revisit and to later say in light of what somebody else has said that maybe yours is the better point of view.*

*Now, I'm not asking anybody—let me make this clear, I'm not asking anybody to give up a firmly held belief. You don't have to do that. But I do ask you to think about it.*

I have had juries to proceed into the evening. In fact, we have had some—we have had juries to stay in here until past midnight, two and three in the morning. I'm not—I don't impose that requirement on any jury. I give you the right to decide your schedule, whether you would like to work additionally this evening, in which event we make a meal available to you, or

---

**4.** Although in *Russell* we "decline[d] to hold that [the modified *Allen* charge] was required," *Russell,* 971 F.2d at 1107 n. 19, the defendant was fighting an even more difficult battle than Burgos, because he had not objected to the charge when it was issued. Consequently, we reviewed Russell's claim under the highly deferential plain error standard, rather than under the relatively more exacting abuse of discretion standard. *Id.* at 1107–08 (holding that Russell could not meet the burden of showing plain error).

**5.** In *West,* the Fourth Circuit refused to overturn a defendant's conviction based on a questionable *Allen* charge, but in that case the only improper aspect of the charge was the district court's reference to the costs of the trial and retrial. 877 F.2d at 291. The court's references to the expense of retrial were not considered unduly coercive. *Id.*

whether you would like to take a break and come back in the morning.

Some judges do it the other way. They send the jury in and say you stay in until you decided. I don't do it that way. I recognize that you have got personal responsibilities, and you have matters that compete for your time and your attention, family responsibilities.

In any event, I am going to ask you to give some further consideration to this matter. And in the meantime, if you feel that you would like to hear the testimony of anyone or more witnesses who have testified, or in the event that you would like to hear me talk some more of an instruction, I doubt that, I already know that I talked too long. In any event, I'm willing to try again to clarify any issues that may be a problem for you.

Remember, in the final analysis, that the Government has the burden to prove by evidence the guilt of the accused on both of the counts.

If the evidence offered by the Government has not convinced you beyond a reasonable doubt of the guilt of the defendant, it is your duty to find him not guilty.

If the evidence, on the other hand, does convince you, the jury, beyond a reasonable doubt that the defendant is guilty, it is your duty to find him guilty.

Now I'm sure there are some things that you haven't been able to agree upon. Once again, it is never my intention—it is not my duty to try and coerce you. The case is in your hands now. You are the judges of the credibility of the witnesses, the weight to be given their testimony. You are the judges of the bottom line.

Now, having said all of that, Mr. Foreman, I am going to ask you to go back into the room and give some further thought to the question, whether given some further time for discussion into this evening, you might be able to resolve this matter; or whether by reason of, you know, any anxieties over personal matters that might arise, you want to go home, come back in the morning. And whether there is any testimony—I don't know whether you would want to consider that. If you decide that you want to recess for the evening, you might in the morning decide or overnight give some thought to whether—let's hear the testimony of thus and such witness again. Or you might decide, let's ask that judge to describe whatever principles it is that may have you in a quandary once again.

So, I leave it to you. You can decide to work on into the evening. If you do, I am going to ask you what you want to do about an evening meal, because we owe you that courtesy, or whether you want to call it a night and come back in the morning.

And also remember my offer to provide for you any assistance that the court can.

Best of luck to you. I don't envy you your job. It is a difficult one. We appreciate you very much. We couldn't operate without you. I know we won't find 12 jurors better equipped to decide this case than you are.

J.A. at 240–44 (emphasis added).

 The most egregious mistake that can be made in the context of an *Allen* charge is for a district court to suggest, in any way, that jurors surrender their conscientious convictions.[6] *See Russell*, 971 F.2d at 1108 (quoting *United States v. Smith*, 353 F.2d 166 (4th Cir.1965)) (recognizing that a

---

**6.** Our primary concerns relate to the lack of a specific charge to the minority and majority factions of the jury to reconsider their positions in light of the other side's views and to the implication that the jurors should reconsider their firmly held beliefs. We are also troubled, albeit to a lesser degree, by the parade of horribles the district court presented to the jury during the charge. Somewhat confusingly, the court informed the jurors that, in the past, juries have deliberated until "two and three in the morning" and that some judges require juries to remain in deliberation until the process is complete. In each instance, however, the judge followed each of these grim examples with the reassurance that "I don't do it that way." If the district court were not going to impose such harsh conditions on this jury, then we fail to appreciate the value of potentially scaring the jurors into a rush to judgment. Similarly, we find no purpose served by instructing this South Carolina jury that a jury in California was, simultaneously, nearing the end of its third week of deliberation.

duty to dissent exists "if dissent is founded upon reasoned conclusions reasonably arrived at and reasonably held"). While the prejudice that can arise from an improper *Allen* charge can be direct, *see Mitchell,* 720 F.2d at 372 (language of *Allen* charge found to intimate that the district court believed the defendant to be guilty), it can also be more subtle, as is the case here, where jurors are asked to think about giving up their firmly held beliefs. Although the district court judge stated that "I'm not asking anybody to give up a firmly held belief. You don't have to do that," his very next statement was "[b]ut I do ask you to think about it." The clear implication of the court's remark is that jurors should think about giving up their firmly held beliefs. Regardless of the district court's intentions, when these three lines are read in conjunction with the court's immediately preceding remarks about pride preventing one from revisiting a position previously taken, it is reasonable to conclude that such remarks would weigh more heavily on those jurors taking a stance contrary to that of the majority of their peers.

■ An evaluation of a suspect *Allen* charge must be conducted, in part, from the perspective of a juror in the minority, because *"[t]hey* always know their minority status, and if fearfully inclined, may presumably suspect a disgruntled judge can find them out." *Sawyers,* 423 F.2d at 1340. Unlike *Sawyers,* in which the trial judge knew that the jury was deadlocked 10–2 in favor of a guilty verdict, *id.* at 1337, we have no basis for knowing how many jurors were in the minority when the foreman informed the district court that the jury was deadlocked. While no one member of a jury deadlocked at a vote of 6–6 may be particularly susceptible to the subtle coercion inherent in the court's

remarks, where only one or two jurors have taken a position contrary to that of the majority, comments about "backing away from an opinion" and "pride" could be interpreted by the jury, and the dissenting jurors, in particular, as being directed at them. Nothing in the district court's charge makes it sufficiently clear that the majority and minority positions are equally credible.

We do not question the motives of the district court in formulating its *Allen* charge, but our evaluation is related less to the judge's intentions and more to the way in which reasonable jurors would interpret the court's remarks. The qualifying statements sprinkled into the court's charge, such as "it is not my duty to try and coerce you" and "I'm not asking anybody to give up a firmly held belief" were not sufficient to remedy the harm done.[7]

The district court's *Allen* charge failed to adhere adequately to the requirements of *Sawyers* and *Stollings.* Specifically, the charge was not sufficiently balanced to ensure that the minority on the jury would not "be coerced into going along with the majority. A decision so arrived at is not the unanimous verdict of each juror, but simply the decision of a majority of the twelve." *Martin,* 756 F.2d at 326. Possibly the best way to explain what is missing from the district court's *Allen* charge is to quote from a portion of an *Allen* charge upheld by an *en banc* panel of this court in *Martin:*

As I said, you haven't got to give up a firm conviction just to go with the crowd, however, if you've got a firm conviction about the case one way or the other, that doesn't mean that you shouldn't listen to reason and think with the others and reason with the others and see if those of you who, as I

---

7. We have previously suggested that where a jury spends substantial time deliberating after having received an *Allen* charge, it is unlikely that there has been coercion. *See, e.g., Russell,* 971 F.2d at 1108 ("the fact that the jury deliberated for approximately three hours after hearing the charge provides adequate assurance that the jury was not improperly coerced by the district court's instruction"); *West,* 877 F.2d at 291 (*Allen* charge claim rejected on ground that jury deliberated two hours following charge which included two cautions to jurors not to surrender their conscientious convictions). In this case, jurors

met for approximately four hours prior to receiving the district court's *Allen* charge, received the next day off, and then deliberated for approximately two hours before reaching a verdict. In light of our concerns with the district court's *Allen* charge, we are not prepared to find that the additional two hours of deliberation were enough to offset the coercive nature of the charge. In *West* and *Russell,* where jurors had been instructed specifically not to surrender their conscientious convictions, there was less likelihood that the jurors had been coerced into returning verdicts.

said, *if you are in the minority on the Jury, listen to the views of the majority; and if you're on the majority on the Jury, you listen to the views of the minority. And don't get yourselves in a position where you turn your back and say do what you want, I'm through.* *Id.* at 325 (emphasis added). The *Martin* court recognized that the charge "treat[ed] the majority and the minority equally and advise[d] each to listen to the views of the other." *Id.* at 326. No portion of the district court's charge in this case comes close to directing *each* side to listen to the other.[8]

■■■ It is critical that an *Allen* charge not coerce one side or the other into changing its position for the sake of unanimity. Judges wield substantial influence over jurors, and we recognize *Sawyers* and *Stollings* as having made an important modification to the standard *Allen* charge by requiring judges to emphasize that it is not only the minority that has a duty to reconsider its position. As we have indicated previously, it is within our power "to treat the giving of the Allen charge, in a form other than that we have repeatedly suggested, as reversible error."[9] *West*, 877 F.2d 281, 291 (4th Cir. 1989). What began as a recommendation in *Sawyers* and evolved into an admonition in *Stollings* now becomes a mandate: regardless of what other specifics are included in an *Allen* charge given to a deadlocked jury, a district court must incorporate a specific reminder both to jurors in the minority and those in the majority that they reconsider their positions in light of the other side's views. Such an instruction applies equally to each juror, regardless of whether that person is alone in dissent or is part of a substantial majority. Failure to provide a sufficiently balanced charge will result in reversal. In the present case, the district court's charge lacked the necessary balance. Burgos is, therefore, entitled to a new trial.

## III.

■■■ We next consider whether the district court should have suppressed in-court identifications of the defendant on the basis that the witnesses who identified Burgos during the trial had been exposed to a suggestive photo display six months earlier. Although the defendant was the only non-African-American depicted in the photo display, all four of the witnesses who testified at trial knew Burgos personally and could base their identification on personal familiarity with Burgos, wholly independent of their exposure to the suggestive photo display. The extent to which the witnesses knew Burgos is a factual determination reviewed for clear error only; legal conclusions reached by the district court concerning the legitimacy of the in-court identification are reviewed *de novo*. *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that before a court makes a final determination about the propriety of a pretrial lineup, the Government must be given the opportunity "to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Id.* at 240, 87 S.Ct. at 1939. The *Wade* Court acknowledged that the degree to which the witness knows the suspect is critical. *See id.* at 241 n. 33, 87 S.Ct. at 1940 n. 33, (noting that factors such as familiarity with the defendant "have an important bearing upon the true basis of the witness' in-court identification"). Because such factors had not been explored by the district court in *Wade*, the Supreme Court vacated the defendant's conviction and remanded the case to the district court for a determination of whether the in-

---

**8.** Interestingly, even the charge evaluated in *Martin* was not as strong as the one approved of in *Sawyers*. Under the *Sawyers* formulation, jurors in the minority and the majority were told to "reconsider" their views in light of the opinions of the other side. *Sawyers*, 423 F.2d at 1342 n. 7. The charge issued in *Martin* only asked jurors to "listen" to the opposing side. The critical component of the charges issued in *Sawyers* and

*Martin*, however, was that each charge spoke directly to the majority and minority.

**9.** Today's decision is not intended to limit district court judges' discretion in formulating *Allen* charges that are best tailored to their particular juries. We leave to the particular judge the task of formulating his or her complete instruction.

court identifications had an independent origin. *Id.* at 242, 87 S.Ct. at 1940.

The information that was lacking in *Wade* existed in this case. The government provided ample support for its claim that each of the witnesses who were scheduled to identify Burgos during the trial knew the defendant personally. Nancy Colclough and Doretha Pringle were called to testify, because Burgos had allegedly gone to their house and picked up a package of cocaine. Burgos engaged in a conversation with Colclough and apologized for having sent a package to her house by mistake. Colclough testified that she had known Burgos for "a couple of months, you know, by seeing him in the neighborhood with those boys." Doretha was also present when Burgos picked up the package, and, like her mother, had known the defendant for several months. Both Colclough and Pringle were unequivocal in their identification of Burgos. Simply put, they were not being asked to identify a stranger, but someone with whom they were well-acquainted.

Notwithstanding the witnesses' personal familiarity with the defendant, Burgos claims that the photo identification process was substantially flawed. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court articulated the test governing cases such as Burgos':

> [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Id.* at 384, 88 S.Ct. at 971. In *Simmons*, the Court held that an out-of-court photographic identification was reliable "even though the identification procedure employed may have in some respects fallen short of the ideal." *Id.* at 385–86, 88 S.Ct. at 972. Each witness to the robbery had seen the suspects for up to five minutes under good lighting conditions, had been able to see the suspects' faces, and had then been shown a photograph display the following day. *Id.* at 385, 88

S.Ct. at 971. In-court identifications have also been upheld even when a witness had only a brief but "real good look" at his assailant in the headlights of a passing car. *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (citing *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970)). In *Simmons* and *Coleman*, in-court identifications were upheld even though witnesses had viewed their assailants for no more than five minutes. Here, because the witnesses knew Burgos personally, the chance of misidentification from a concededly suggestive photo display is virtually non-existent. These witnesses' in-court identifications of Burgos were based on far more than a brief glimpse, five minutes of study, or an overly suggestive photograph display. In fact, every indication is that all four witnesses could have identified Burgos just as easily had they not seen the photographs.

■ The facts of this case are very similar to those in *United States v. Hughes*, 716 F.2d 234 (4th Cir.1983), in which this court held that an in-court identification was not so unreliable as to require suppression of the identification. Such determinations are to be made "according to the totality of the circumstances." *Id.* at 241. In *Hughes*, we recognized that the conditions under which the photos were displayed were less than ideal, *id.*, but any error certainly did not rise to the level of "very substantial likelihood of irreparable misidentification," as had been required in *Simmons*. *Id.* There was a far greater chance of misidentification in *Hughes* than in this case, because the victim in *Hughes* had not known the defendant prior to having been beaten by him. *Id.* at 236. In this case, by the time the witnesses were shown the photographic display that included Burgos, they had known him for a considerable length of time.

■ Although the photographic display had the *potential* for leading to an irreparable misidentification, the critical component of our analysis is that, in the end, it was not the photograph that resulted in Burgos' identification by the four witnesses. Clear and convincing evidence exists that the witnesses's in-court identifications derived from

an independent origin. *Wade,* 388 U.S. at 242, 87 S.Ct. at 1940. Consequently, we refuse to overturn Burgos' conviction on this ground.

## IV.

Having found that Burgos was not prejudiced on the basis of the in-court identifications, we reverse the defendant's conviction and remand for a new trial solely on the basis of the improper *Allen* charge. The judgment of the district court is accordingly

*REVERSED AND REMANDED.*