UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                          No. 99-6096

TIMOTHY W. MCCOY,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(CR-92-189, CA-97-85-1)

Submitted: July 20, 1999

Decided: August 16, 1999

Before WIDENER, ERVIN, and WILKINS, Circuit Judges.

_____

Dismissed by unpublished per curiam opinion.

_____

**COUNSEL**

Timothy W. McCoy, Appellant Pro Se. Samuel Gerald Nazzaro, Jr.,
Assistant United States Attorney, Wheeling, West Virginia, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Timothy W. McCoy appeals the dismissal of his 28 U.S.C.A. § 2255 (West Supp. 1999) action. McCoy was convicted by a jury of operating a continuing criminal enterprise ("CCE") and conspiracy, involving the manufacture and distribution of marijuana, as well as various other crimes, including money laundering, tax evasion, and suborning perjury. On appeal, we vacated the conspiracy conviction as a lesser-included offense of operating a CCE and affirmed the remaining convictions. See United States v. Heater, 63 F.3d 311, 332 (4th Cir. 1995). McCoy then filed this § 2255 motion, arguing a plethora of grounds. The district court denied the motion, without a hearing and without requesting a response from the Government.

I.

McCoy, his girlfriend Connie Heater, and other individuals were involved in the cultivation, possession, and distribution of marijuana in West Virginia. McCoy's operation was substantial, and the evidence showed that it involved nearly six million dollars worth of marijuana. McCoy supervised at least five workers who constructed irrigation systems, painted fences, harvested the crops, laundered drug money, and distributed marijuana. See Heater, 63 F.3d at 315-16.

McCoy was tried along with Heater, his father Richard McCoy, and other indicted co-conspirators. Other co-conspirators testified under grants of immunity or plea agreements with the Government.

McCoy and his father Richard retained, respectively, J. Michael Benninger and Clark B. Frame, of the law firm of Wilson, Frame & Metheney. The court conducted a Fed. R. Crim. P. 44(c) hearing prior to trial, presenting to both defendants the potential for a conflict of interest. Both defendants signed waivers. After the case went to the jury, Benninger requested permission to leave the courthouse and have Frame represent his client during deliberations. With the consent of both defendants, the court agreed.[1]

_____

[1] The McCoys' consent to dual representation during deliberations is contained in the record. However, although McCoy and the district court

2

The jury consisted of eleven women and one man, Matthew Smith. During trial, Smith approached several of the defendants. According to an affidavit filed by Harvey John, a co-defendant, Smith first approached John, and they briefly discussed mutual acquaintances. Smith again approached John and attempted to talk to him, but John told him that the discussion was improper and promptly left. According to John, Benninger witnessed the second exchange and inquired as to whether Smith had tried to talk to John. John answered "he tryed [sic]." After closing arguments, Smith met with Tim McCoy, Heater, and John in a car. They smoked marijuana, and Smith allegedly told Tim and the others that Richard McCoy would be acquitted. Smith also indicated that he felt all the defendants were not guilty.[2]

McCoy alleges that he immediately informed Frame (as Benninger was not present) that Richard McCoy would be found not guilty. McCoy then allegedly began to explain to Frame that his information was based on juror contact, but Frame stated, "Don't tell me, I don't want to hear it."

During deliberations, the jury sent out an unsigned note, stating that one hold-out juror was convinced of the Defendants' innocence. After Frame objected to the rereading of any portions of the jury charge, the court instructed the jury to continue deliberating. Subsequently, Smith sent out a signed note stating that he could not attend the next day, due to a scheduled job interview. The court did not respond to this note. Several hours later, the jury returned their verdicts, which inter alia found Tim McCoy guilty on all charges and acquitted Richard McCoy.

After the verdicts were returned, Benninger filed a motion for a new trial based on juror misconduct. However, he did not support his motion with factual specifics or affidavits, asserting that he was concerned about McCoy incriminating himself. Benninger stated at the

_____

agree that a second Rule 44(c) hearing was held, the record does not contain a transcript of any discussion between counsel and the court regarding this issue.
[2] Smith has pled guilty to obstruction of justice. Tim, Heater, and John all testified at his grand jury proceeding.

3

hearing that he was attempting to negotiate some sort of an immunity agreement for McCoy, but the Government had not yet agreed. The court denied the motion for lack of a factual basis. On appeal, Benninger again raised this issue. At the time, only John had testified before Smith's grand jury, and Benninger related that information to this court, but still presented no affidavits in support of his factual allegations. We denied the appeal on this issue for lack of factual support but stated that a collateral attack might still be possible. See Heater, 63 F.3d at 321-22.

II.

McCoy raises several claims attacking the performance of Frame during jury deliberations. In order to succeed on a claim of ineffective assistance of counsel, McCoy must show: (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance was prejudicial. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Under the first prong of Strickland, McCoy must demonstrate that counsel's performance fell below an objective standard of reasonableness under "prevailing professional norms." Id. at 688. To satisfy the second prong of Strickland, McCoy must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. However, this court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). Instead, this court can only grant relief under the second prong of Strickland if the "result of the proceeding was fundamentally unfair or unreliable." Id. at 369.

Assuming McCoy has satisfied the first prong of Strickland by alleging that Frame knew of the juror misconduct, and failed to disclose it, we find that McCoy cannot satisfy the second prong of Strickland. He was a party to the misconduct, and he was present in court when the jury was instructed not to discuss the case with anyone. Furthermore, any bias created by the presence of Smith on the jury would have been in favor of McCoy. In addition, McCoy could have informed the court of the misconduct, even if Frame declined to do so. We therefore find the verdict was neither unfair nor unreliable.

4

McCoy next contends that Frame failed to object to an off-the-record discussion concerning the fact that the jury was split eleven to one for conviction. Because the discussion was off the record, there is not much information available about what occurred. McCoy attaches to his informal brief a letter from Benninger relating Heater's trial attorney's recollections of this off-the-record discussion.

According to this letter, at approximately 11:20 a.m., the court conducted a discussion regarding the jury note that indicated one juror believed that all defendants were not guilty. The judge then recommended rereading part of the jury charge. Frame objected, stating that it would be non-productive and coercive. The judge then decided not to reread any particular portion of the charge. The jury was not brought back into open court, but instead the judge prepared a written note which read as follows:

> You have been instructed as to your deliberations, you have a copy of the Charge, consider it as a whole, including Pages 1-14 and Pages 61-63 for a response to your question.[3]

According to McCoy, after the judge had responded to the jury's question, Smith sent out a signed note stating that he was unavailable the next day. This note was apparently never answered. The jury returned their verdicts at approximately 7:00 that evening.

The district court states the facts somewhat differently in its opinion. The judge recalls receiving the note disclosing the numerical division and then telling the jury they should keep deliberating. Subsequently, Smith sent out a note stating that he could not attend the next day. Over Frame's objection, the court then allegedly gave an Allen charge, pursuant to Allen v. United States, 164 U.S. 492 (1896),

_____

[3] This is not a precise quote but merely based on Heater's lawyer's recollections. The written note was not made part of the record. In addition, although McCoy and the district court quote from portions of the jury charge, the charge was never recorded, transcribed, or made part of the record. It is possible that McCoy and the district court have saved copies of the charge from the trial, but neither has submitted these instructions. In any event, we do not know what is contained on pages 1-14 or 61-63.

5

in the modified form stated in <u>United States v. Stollings</u>, 501 F.2d 954 (4th Cir. 1974).**4**

McCoy has not alleged what prejudice he suffered when his attorney failed to object to the discussion regarding the jury split. While for purposes of appellate and collateral review, it would certainly have been simpler if this discussion were on the record, McCoy has failed to show how a transcript of the proceeding would have resulted in a different outcome. Even assuming the facts are as McCoy presents them, Frame objected to a rereading of the charge to the jury, his objection was sustained, and the court told the jury to consider the charge as a whole and to keep deliberating. While it would be error for the judge to inquire into the numerical division of the jury, <u>see Brasfield v. United States</u>, 272 U.S. 448, 450 (1926), here the judge was inadvertently told about the split and then discussed the ramifications with counsel. Because McCoy has failed to show any prejudice from the failure to object to this discussion being off the record, this claim fails.

McCoy asserts that Frame erred by failing to move for a mistrial after the district court's coercive <u>Allen</u> charge.**5** As discussed above, however, there is very little evidence as to what the judge's charge contained. According to Heater's attorney's notes, there was no <u>Allen</u> charge, but merely a note to the jury telling them essentially to keep deliberating. According to the district court, the <u>Allen</u> charge was noncoercive and carefully instructed the jury that both the majority and minority should reexamine their positions in light of the other side's views, but admonished the jury not to surrender well-founded convictions. McCoy asserts that any charge was improper based on the judge's knowledge of the jury split and the fact that the jury returned quickly thereafter.

_____

**4** There is no record of an <u>Allen</u> charge being made to the jury.
**5** Generally, an <u>Allen</u> charge informs the jury that a new trial would be expensive for both sides, there is no reason to believe that another jury would do a better job, that it is important that a unanimous verdict be reached, and that the jurors should consider the opinions of the jurors on the other side. <u>See United States v. Burgos</u>, 55 F.3d 933, 936 (4th Cir. 1995).

6

The judge's knowledge of the jury split is just one factor that could show a coercive charge. The fact that the judge knew of the jury split, standing alone, does not make the Allen charge coercive. See United States v. Lorenzo, 43 F.3d 1303, 1307 (9th Cir. 1995) (upholding Allen charge to 11-1 deadlocked jury). In addition, McCoy mistakenly alleges that the jury did not deliberate following the charge. The record reveals that the jury did not return with the verdicts until nearly eight hours after the court instructed them to keep deliberating. Thus, McCoy has failed to show that Frame erred in deciding not to request a mistrial following the Allen charge.

McCoy next asserts that Frame should have requested polling of the jury regarding the Allen charge. In addition, because several of his co-defendants were acquitted, McCoy contends that the jury should have been questioned regarding the basis for his conspiracy and CCE convictions.

In fact, the jurors were polled and asked if they agreed with the verdict. McCoy presents no authority for the conclusion that he would have been entitled to any further questioning if Frame had so moved. While the trial court has substantial discretion to decide how the jury should be polled, any motion by Frame for further inquiries would likely have been denied. See United States v. Carter, 772 F.2d 66, 68 (4th Cir. 1985) (best practice is for court or clerk of court to ask each juror individually whether verdict announced is his verdict); see also Fed. R. Evid. 606(b) (juror may not testify as to the jury's deliberations or as to the effect of anything on the juror's mind or emotions). Thus, McCoy is unable to show either attorney error or prejudice on this claim.

McCoy next argues that, in representing both him and his father, Frame labored under an impermissible conflict of interest during jury deliberations. According to McCoy, because Frame knew that Richard McCoy would be acquitted, he did not move for a mistrial or object to the Allen charge, even though these actions might have benefitted Tim.

In general, to prevail on a claim of conflict of interest, a petitioner must present convincing evidence of an actual conflict and a resulting adverse effect on performance. See Beaver v. Thompson, 93 F.3d

7

1186, 1192 (4th Cir. 1996). First, McCoy cannot show an actual conflict. If Frame were aware that Richard McCoy would be acquitted, he was also aware that Smith believed Tim to be innocent of the charges. Therefore, it would be reasonable to avoid a mistrial so that Smith, who had declared his allegiance to the defense, would be on the jury. Second, even if Frame operated under a conflict of interest, there was no adverse effect. As discussed above, McCoy cannot show prejudice from Frame's failure to object to the off-the-record discussion, request a mistrial following the Allen charge, or request further polling of the jury. McCoy presents no other actions that Frame would have taken had he not had a conflict. Accordingly, because McCoy cannot show adverse effect, this claim must fail.

III.

McCoy also attacks the trial court's decision regarding the Allen charge and disclosure of the jury split. As discussed above, there was no error in the disclosure of the jury split to the attorneys and parties. While it is unclear what the Allen charge contained or even if it existed, McCoy has not specifically alleged any improper language. In any event, as outlined above, McCoy suffered no harm from the court's actions, and thus, he is not entitled to relief.

IV.

McCoy twice waived his right to conflict-free representation: once, pretrial, and then again before jury deliberations. A defendant may waive his right to assistance of counsel unhindered by conflicts of interest. See Holloway v. Arkansas, 435 U.S. 475, 483 n.5 (1978). The district court found that the requirements of Rule 44(c) were met and the ensuing waiver was valid.

McCoy contends, however, that his second waiver was unknowing and involuntary. Yet, he presents no support for this statement. McCoy does not assert that anything was not disclosed to him, and he does not allege precisely what he supposedly did not understand. In fact, the only undisclosed conflict that McCoy points to is the allegation that Frame's knowledge of Richard McCoy's likely acquittal affected his own representation. However, the court had no knowledge of jury impropriety until after the trial had ended and, therefore,

8

could not have so informed McCoy. Further, as discussed above, McCoy suffered no harm from the dual representation.

V.

McCoy also attacks many actions by Benninger under the umbrella of ineffective assistance of counsel. First, McCoy asserts that Benninger knew of the improper juror contact, and therefore, when Benninger returned to the courthouse, he should have investigated what had occurred and corrected Frame's alleged mistakes. McCoy's basis for alleging that Benninger knew of Smith's contact with the Defendants is John's affidavit. As outlined above, John alleged that Benninger saw him with Smith, Benninger asked if Smith tried to talk to him, and John responded, "he tryed [sic]."

There is no allegation that Benninger knew either that Smith had discussed jury deliberations with the Defendants or that Smith had smoked marijuana with them. While Benninger should have informed the court that Smith tried to talk to John, the court likely would have just examined Smith and reinstructed the jury. Further, for the reasons discussed above, even if the court took further action, such as replacing Smith or declaring a mistrial, McCoy still could not show prejudice under Strickland, because the result of his trial was neither unfair nor unreliable.

Because, at most, Benninger only knew that Smith had tried to talk to John, there was no basis for him to take any further action once he returned to the courtroom regarding the juror notes or the Allen charge. There were simply no grounds for Benninger to conclude that Frame or the court had erred.

McCoy next asserts that Benninger improperly failed to file a brief or an affidavit in support of the factual allegations of juror misconduct at either the post-trial motion stage or on appeal. However, Benninger was understandably concerned about McCoy implicating himself. He attempted to secure immunity for McCoy, but when that attempt failed, he determined that it would be too dangerous for McCoy to file an affidavit. We find that such a strategy was reasonable.

9

On appeal, Benninger informed the Court that John had testified before Smith's grand jury. McCoy argues that Benninger could and should have obtained the transcripts of these proceedings. However, grand jury transcripts are generally secret and cannot be disclosed absent a court order. See Fed. R. Crim. P. 6(e). Therefore, failure to obtain these transcripts was not error.

McCoy asserts that Benninger should have objected to many portions of the Government's closing argument. Most significantly, the Government stated in its closing argument that McCoy sold marijuana around schools. This evidence was allegedly testified to by Randy Foster, Bob Bailey, Jerry Burkhammer, and Bobby Timms. However, these witnesses testified that they bought marijuana from McCoy while he was a high school student, but they never testified that they bought the marijuana near a school. While the Government's statement was incorrect, it was merely one sentence in an argument that covers sixty-three pages of transcript. Based on the overwhelming evidence against McCoy, we find that failure to object to this statement did not prejudice his defense. We have carefully reviewed the remainder of McCoy's arguments that Benninger erroneously failed to object to the Government's closing argument, as well as the district court's decision on these points, and we are in agreement with the district court's reasoning, which we hereby adopt.

McCoy next contends that Benninger showed him plea offers by the Government but never fully informed him about the advantages of the pleas or the dangers of going to trial. McCoy contends that, had he known all the implications, he would have pled guilty. Specifically, he states that he should have been told that he would be eligible for an acceptance of responsibility reduction and told that he would not have to testify against his girlfriend and father.

Professional standards require that counsel present a plea offer to a defendant, outline its terms, give an opinion of probable outcomes, advise on the pros and cons of the alternatives, and allow a defendant to make the ultimate choice for accepting or rejecting a plea. See Jones v. Murray, 947 F.2d 1106, 1110 (4th Cir. 1991). However, even if Benninger failed to comply with Jones, McCoy must also show that he would not have pled guilty absent Benninger's incompetence. See Hill v. Lockhart, 474 U.S. 52, 59 (1985). This McCoy cannot do.

10

If McCoy had pled guilty, there is no certainty that he would have been granted a reduction for acceptance of responsibility. At trial, he denied selling or manufacturing marijuana, and the evidence showed that he suborned perjury at the grand jury stage. If he had pled guilty after his indictment, his grand jury actions would have made a reduction unlikely. Further, as part of a standard plea agreement, he would likely have been debriefed by the Government and would not have been able to shield his girlfriend and father. At the very least, by refusing to give details about his business and co-conspirators, he could ensure that he would not be entitled to an acceptance of responsibility reduction. Because McCoy would not have been entitled to the benefits he now says would have induced him to plead guilty, he has not shown prejudice from his counsel's alleged failure to fully inform him about the plea offers.

McCoy asserts that Benninger erred by failing to appeal on the basis of prosecutorial misconduct during the closing argument and alleged error in delivering the Allen charge. For the reasons discussed above, McCoy cannot show that these claims would have been successful on appeal. Counsel succeeded on appeal in obtaining a reversal of McCoy's conspiracy conviction. We, therefore, find that Benninger's appellate strategy was sound and not ineffective.

McCoy contends that much of the evidence at trial described a buyer/seller relationship with the witnesses, rather than a continuing criminal enterprise. However, he asserts that the jury instructions permitted the jury to use the evidence of buyer/seller relationships to find that McCoy was a manager or supervisor, for purposes of the CCE charge. See 21 U.S.C. § 848(c) (1994). Therefore, McCoy contends that Benninger should have requested an instruction that a mere buyer/seller relationship was insufficient for purposes of § 848(c).

McCoy references two portions of the jury charge as erroneous, because they allegedly permitted a CCE conviction to be based on only a buyer/seller relationship. The first contested part stated that the jury should consider the evidence that distinguishes a manager from a mere underling. Examples given by the court of managerial duties were negotiating large-scale purchases or sales of narcotics, making arrangements for transportation, organizing money-laundering, and instructing participants. The jury was then instructed that these factors

11

were not conclusive but could be used to think about the defendant's role and his relationship to the other persons involved. The other contested language defined the term "distribution."

The jury instructions, as quoted by McCoy, were not erroneous. The jury was specifically instructed that they must find McCoy to be a manager and that a manager was to be distinguished from a mere underling in an enterprise. Furthermore, instructing participants in relation to large-scale purchases and arranging the transportation and laundering of the money does not describe a mere buyer-seller relationship. See United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989) (exercising control over the how, when and from whom elements of a drug deal is sufficient to show management role). Even if the jury could have been somewhat confused by this language, they were then instructed that these inquiries were not conclusive and that they must still determine that McCoy was a manager viewing the evidence as a whole. Finally, the definition of distribution was apparently used in the context of defining the required underlying felony violations of narcotics laws, which are a separate element of a CCE charge. See 21 U.S.C. § 848(c)(1). Therefore, these instructions were not in error.

McCoy was charged with a conspiracy dating from 1979 and a CCE beginning in 1986. McCoy did not turn eighteen until sometime in the early 1980's. On these facts, McCoy asserts that Benninger erred by failing to move to suppress evidence of crimes preceding his eighteenth birthday.

When a conspiracy begins before a defendant's eighteenth birthday, but continues beyond that date, evidence of pre-majority conduct may not be used to provide the sole basis for a guilty verdict. However, such conduct may be relevant to proving defendant's knowledge of the conspiracy and the conspiracy's purpose. See United States v. Spoone, 741 F.2d 680, 687 (4th Cir. 1984). In Spoone, this court approved the use of a limiting instruction regarding the pre-majority conduct as a method of ensuring that the defendant was not convicted solely on the basis of that conduct. See id.

In this case, there was no limiting instruction, and the Government's argument and the jury instructions permitted pre-majority con-

12

duct to be considered for the purposes of determining guilt. However, McCoy has failed to show prejudice from Benninger's failure to object, because McCoy's conspiracy conviction has already been vacated. While he still stands convicted of CCE, that charge only related to post-1986 conduct, and therefore, while his pre-majority conduct may have been considered in determining his knowledge and plan, it could not have properly been used to determine the actual elements of CCE. Accordingly, McCoy has failed to satisfy the requirements of showing ineffective assistance.

McCoy contends that Benninger should have moved for acquittal or to dismiss the indictment of counts based on pre-majority conduct. While Benninger likely should have taken some action regarding McCoy's pre-majority conduct, the issue is now moot as the conspiracy conviction has been vacated. McCoy presents no reason to believe that the jury considered pre-majority conduct as evidence of guilt on the CCE charge, and therefore, McCoy can show no prejudice from Benninger's failure to address this issue.

McCoy asserts that the evidence did not show a conspiracy before the mid-1980's, and thus, Benninger should have requested an instruction that pre-conspiracy conduct was barred by the statute of limitations. Since McCoy was not charged with any substantive distribution counts, it is unclear what benefit McCoy hoped to gain through this instruction. In any event, as the conspiracy charge was dismissed, any argument McCoy has with the proof on that charge is moot, and he cannot show prejudice from Benninger's actions.

McCoy next contends that Benninger erred by failing to object to misleading, contradictory and confusing portions of the jury charge. We affirm the dismissal of these claims on the reasoning of the district court.

Next, relying on 18 U.S.C. § 201(c)(2) (1994), McCoy contends that Benninger should have moved to suppress the testimony of co-conspirators who received immunity or recommended sentence reductions from the Government in exchange for their cooperation and testimony. Every circuit that has addressed this issue has concluded that Government promises of the kind offered in this case do not violate § 201. See United States v. Lowery, 166 F.3d 1119, 1122-23 (11th

13

Cir. 1999) (citing cases); United States v. Singleton, 165 F.3d 1297, 1302 (10th Cir. 1999) (en banc court reversing three judge panel), cert. denied, ___ U.S. ___, 1999 WL 185874 (U.S. June 21, 1999) (No. 98-8758). Especially considering that McCoy's trial predated the recent explosion of § 201 analysis that followed the unprecedented holding of the original Singleton decision, we find that Benninger's performance in not objecting to these witnesses did not fall below objective standards of reasonable conduct.

McCoy asserts that Benninger should have requested a special verdict form in order to determine whether the jury improperly relied upon pre-majority conduct, improperly merged the conspiracy and CCE charges, or were confused regarding the requirements for a CCE conviction. This argument is basically a retread of many of McCoy's other arguments which have been addressed in detail above. Because the jury instructions were not in error, there is no reason to believe that the jury was laboring under any misconceptions. Thus, any motion by Benninger for a special verdict form would likely have been denied.**6**

VI.

McCoy next asserts that the Government committed prosecutorial misconduct during the closing argument. To prevail on a claim of prosecutorial misconduct, a defendant must show that the remarks were improper and that they prejudicially affected his substantial rights so as to deprive him of a fair trial. See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993). For the reasons discussed above regarding ineffective assistance, we find that the few improper comments made by the prosecutor were isolated and did not affect McCoy's right to a fair trial.

_____

**6** The trial court noted post-trial that it was possible the jury convicted of conspiracy based on the same exact acts as the CCE and that, in the future, the court would use a special verdict form when a pre-existing conspiracy merges into a CCE. However, since the conspiracy conviction was vacated, any error has already been rectified.

14

VII.

Finally, McCoy contends that the cumulative effect of all of the alleged errors entitles him to relief. As discussed above, in his multitude of claims, McCoy has alleged several meritorious trial errors, i.e. improper closing argument, failure to inform the court of juror misconduct, failure to request a limiting instruction on pre-majority conduct, etc. However, our review of the record leaves us convinced that he cannot show prejudice even from the combination of all of the alleged errors.

Accordingly, we deny a certificate of appealability and dismiss the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

DISMISSED

15