**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RICHARD ANTHONY TUCKER,
Petitioner-Appellant,

v.

WILLIAM D. CATOE, Director, South

Carolina Department of Corrections;
CHARLES M. CONDON, Attorney
General, State of South Carolina,
Respondents-Appellees.

No. 99-14

RICHARD ANTHONY TUCKER,
Petitioner-Appellee,

v.

WILLIAM D. CATOE, Director, South

Carolina Department of Corrections;
CHARLES M. CONDON, Attorney
General, State of South Carolina,
Respondents-Appellants.

No. 99-15

Appeals from the United States District Court
for the District of South Carolina, at Rock Hill.
Solomon Blatt Jr., Senior District Judge.
(CA-98-681-0-8BD)

Argued: April 4, 2000

Decided: June 13, 2000

Before NIEMEYER, MICHAEL, and KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Thomas Ross Haggard, Ridgeway, South Carolina, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellees. **ON BRIEF:** Teresa L. Norris, CENTER FOR CAPITAL LITIGATION, Columbia, South Carolina, for Appellant.

_____

**OPINION**

KING, Circuit Judge:

Richard Anthony Tucker, convicted of murder and sentenced to death by the state courts of South Carolina, appeals from the district court's dismissal of his petition for a writ of habeas corpus. Finding no error, we must affirm the judgment of the district court.

I.

In the evening of August 1, 1992, seventy-nine-year old Carrie Alley was sexually assaulted, beaten, and strangled in her home. Tucker was subsequently arrested as he attempted to unlock Ms. Alley's car, and at the time of his arrest, he was carrying several checks belonging to Ms. Alley, along with some of her jewelry. The investigation that followed produced physical evidence, including blood, DNA, and fingerprint evidence, that linked Tucker to the sexual assault and murder.

Tucker was then indicted and tried in the Court of General Sessions for Spartanburg County, South Carolina. On October 25, 1993, a jury convicted Tucker of grand larceny, first degree burglary, criminal sexual assault in the first degree, and murder. The sentencing proceedings began on October 26, 1993, and on October 28, 1993,

2

Tucker was sentenced to death by the court upon the jury's unanimous recommendation.

Tucker has never challenged any of the guilt-phase proceedings; however, he has maintained that several components of the sentencing proceeding and direct appeal were flawed. Following the denial of his application for post-conviction relief in the South Carolina state courts, the district court for the District of South Carolina dismissed Tucker's petition for habeas corpus and granted a certificate of appealability. See 28 U.S.C. § 2253. The facts and proceedings underlying Tucker's arguments have been recounted in two published decisions. See State v. Tucker, 462 S.E.2d 263, 264-66 (S.C. 1995); Tucker v. Moore, 56 F. Supp. 2d 611, 613 (D.S.C. 1999). In our discussion below, we focus only upon those facts relevant to the issues raised herein.

II.

At the outset, the Government contends that we may not consider the merits of Tucker's petition for habeas corpus relief because his petition is time-barred. In this vein, two separate statutes of limitations are potentially applicable to petitions for federal habeas corpus in capital cases. For states that comply with certain conditions, federal law provides for expedited procedures for review, including a 180-day period within which the petition for habeas corpus relief must be filed in federal court. See, e.g., 28 U.S.C. § 2263(a) (2000).[1] Proceedings involving other states are governed by different provisions, which include a 1-year period in which the habeas corpus petition must be filed. See 28 U.S.C. § 2244(d)(1).[2] There is no dispute that Tucker's petition for federal habeas corpus relief was filed after the

_____

[1] Subject to several other provisions, 28 U.S.C. § 2263(a) provides: "Any application under this chapter for habeas corpus relief under section 2254 must be filed in the appropriate district court not later than 180 days after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review."
[2] Subject to several other provisions, 28 U.S.C. § 2244(d)(1) provides: "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."

3

180-day filing period had expired but within the 1-year filing period. Therefore, his petition is timely if the provisions of 28 U.S.C. § 2244(d)(1) apply to his petition, and it is untimely if the provisions of 28 U.S.C. § 2263(a) control.

In order for the expedited habeas corpus procedures for capital cases ("capital-specific provisions") promulgated in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to control, a state must first satisfy the provisions of 28 U.S.C.§ 2261(b) & (c) (2000):

> (b) This chapter is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

> (c) Any mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence and must provide for the entry of an order by a court of record --

> (1) appointing one or more counsels to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

> (2) finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

> (3) denying the appointment of counsel upon a
> finding that the prisoner is not indigent.

28 U.S.C. § 2261. Thus, a state must satisfy the conditions established in 28 U.S.C. § 2261 in order to invoke the time limitations of section 2263.

The State asserts that it has complied with section 2261 through two authorities. First, South Carolina has enacted S.C. Code Ann. § 17-27-160 (1999), which establishes standards for the appointment of counsel to represent defendants in capital post-conviction relief proceedings, establishes standards for qualification of counsel in order to be appointed, and provides for compensation and litigation expenses in these cases. Second, the Supreme Court of South Carolina, in In re Stays of Execution in Capital Cases, 471 S.E.2d 140, 141 (S.C. 1996), promulgated several requirements relating to representation issues in capital cases, including a requirement for the timely appointment of counsel for state post-conviction relief. Both S.C. Code Ann. § 17-27-160 and the rules set forth in In re Stays of Execution in Capital Cases, supra, were promulgated before the appointment of the lawyers who represented Tucker in his application for post-conviction relief.

In this case, however, it is undisputed that the lawyers appointed by South Carolina to represent Tucker in seeking post-conviction relief did not meet the State's requirements under S.C. Code Ann. § 17-27-160(B). Nonetheless, the State contends that it is entitled to benefit from the 180-day limitations period available under section 2263(a) because it enacted a "mechanism" within the meaning of 28 U.S.C. § 2261(b). At its base, this is an argument that a state may benefit from the capital-specific provisions and expedited procedures available under AEDPA if it enacts standards of competency for post-conviction relief counsel, even if the state fails to abide by its mechanism or appoint counsel that meet its standards of competency.

In Bennett v. Angelone, 92 F.3d 1336, 1342 (4th Cir. 1996), the Commonwealth of Virginia contended that its mechanism for the appointment of competent counsel to represent indigent petitioners in post-conviction proceedings satisfied 28 U.S.C. § 2261, and that Virginia was thus permitted to invoke the capital-specific provisions of

5

AEDPA. In that case, we declined to reach the issue of whether the Commonwealth's mechanism satisfied 28 U.S.C. § 2261 because the Commonwealth had not enacted its "mechanism" until after the petitioner's habeas corpus petition had been finally denied by the Supreme Court of Virginia. We recognized, in Bennett, that AEDPA "establishes a quid-pro-quo relationship: A state seeking greater federal deference to its habeas decisions in capital cases must, by appointing competent counsel to represent indigent petitioners, further ensure that its own habeas proceedings are meaningful." 92 F.3d at 1342. Because Virginia's mechanism had not actually been applied to the petitioner, the Commonwealth could not invoke the capital-specific provisions of AEDPA: "[A]pplying[the capital-specific provisions] to Bennett's petition would upset the`quid pro quo arrangement' [AEDPA] was supposed to establish." Id.

The import of Bennett is clear: the mere promulgation of a "mechanism" is not sufficient to permit a state to invoke the capital-specific provisions of AEDPA. See also Smith v. Moore, 137 F.3d 808, 812 n.1 (4th Cir. 1998) (holding that South Carolina may not invoke capital-specific provisions of AEDPA because petitioner's habeas corpus petition was finally decided before state's"mechanism" enacted). We accordingly conclude that a state must not only enact a "mechanism" and standards for post-conviction review counsel, but those mechanisms and standards must in fact be complied with before the state may invoke the time limitations of 28 U.S.C. § 2263. Not only is this conclusion consistent with our precedent, but it is also consistent with common sense: It would be an astounding proposition if a state could benefit from the capital-specific provisions of AEDPA by enacting, but not following, procedures promulgated pursuant to 28 U.S.C. § 2261. In this context, Tucker's petition for habeas corpus, filed within the 1-year limitations period, was timely-filed.**3**

III.

Although the capital-specific provisions of AEDPA do not apply here, the general provisions of AEDPA are applicable. Under those general provisions, a federal court may not grant a writ of habeas cor-

_____

**3** We find it unnecessary to address whether South Carolina's attempt to comply with 28 U.S.C. § 2261 actually did so.

pus unless the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court recently addressed this statutory provision in Williams v. Taylor, 120 S. Ct. 1495, 1520 (2000), and held:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Id. at 1520. The Williams Court made clear that an objective approach is appropriate:

> The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.
>
> ***
>
> Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 1521-22.

7

In our consideration of Tucker's petition for habeas corpus relief, we must apply the principles mandated by section 2254(d)(1) and the Court's decision in <u>Williams</u>.

IV.

Tucker raises two separate Sixth Amendment claims of ineffective assistance of counsel arising out of the South Carolina trial court's <u>Allen</u> charge[4] and the facts surrounding the administration of that charge during the penalty phase of his trial. First, Tucker claims that his trial counsel was constitutionally ineffective in failing to object to the <u>Allen</u> charge on the basis of a South Carolina statute, S.C. Code § 14-7-1330, which prohibits an <u>Allen</u> charge under certain circumstances. Second, Tucker asserts that his counsel on direct appeal was ineffective in failing to challenge the <u>Allen</u> charge on the same bases raised in the trial court, because appellate counsel's failure to do so resulted in the procedural default of his <u>Allen</u> charge arguments. We consider these Sixth Amendment claims in turn.

A.

Because the facts surrounding the administration of the <u>Allen</u> charge in the penalty phase of Tucker's trial are central to his claims, we review them in some detail. The following is a summary of the jury's deliberations and trial court's reactions thereto, summarized from the findings of the South Carolina state court that considered Tucker's petition for post-conviction relief ("state PCR court").

- On the morning of October 27, 1993, the jury, having already convicted Tucker during the guilt stage of the proceedings, hears summations in the penalty phase and receives its charge.

- Jury deliberations begin at 1:33 p.m.

_____

[4] The term "<u>Allen</u> charge" is derived from a Supreme Court decision handed down more than 100 years ago; this instruction "is given by a trial court when a jury has reached an impasse in its deliberations and is unable to reach a consensus." <u>United States v. Cropp</u>, 127 F.3d 354, 359 (4th Cir. 1997) (citing <u>Allen v. United States</u>, 164 U.S. 492 (1896)).

8

- At 5:02 p.m., jury returns with a question:"In the event of a deci-
    sion for a life sentence -- what is the possibility of parole, if any"
    (J.A. 175), and the trial court gives instructions discussed <u>infra</u> at
    24.

- Sometime between 5:03 p.m. and 5:55 p.m., the jury returns with
    a second note: "We are deadlocked at 10-2 for the death penalty.
    We are not making any further progress. We would like to hear
    Richard Tucker's testimony, and then continue our deliberation
    until 10:00 PM -- unless we reach a verdict before then." J.A.
    176. The trial court does not read this note to counsel; it does tell
    counsel that the jury wanted to rehear testimony (to which there
    is no objection). The jury declines the court's offer to order dinner,
    preferring to wait until after the testimony is replayed. Testimony
    is then replayed over the next hour, and the jury retires to deliber-
    ate at 6:53 p.m.

- Around 8:03 p.m., the jury sends another note: "We are not going
    to reach a decision tonight. We would like to go back to the motel
    and resume deliberations in the morning. (We can eat at the
    motel)." J.A. 177. No party objects, and the jury is excused for the
    evening.

- The jury returns and begins deliberations the next day at 9:00 a.m.
    Around 10:44 a.m., the jury sends another note:"We are hope-
    lessly deadlocked at 11-1 for the death penalty. I do not feel we
    will ever get a unanimous decision." J.A. 178. Again, the trial
    court does not read the note in court; instead, it informs the parties
    that it intends "to bring them back in to inquire and perhaps to give
    them additional instruction." J.A. 164. Tucker's counsel then
    objects:

    Well, let met [sic] state that I know that the Court
    is going to give additional instructions. Prior to
    anything that would be either a watered-down ver-
    sion of an Allen charge, we would ask that the
    Court inquire as to whether or not in the jury's
    opinion they feel that they are hopelessly dead-
    locked.

9

Additionally, we would further submit that if the Court gives a charge that would be, again, a watered-down Allen charge we would also request that the Court instruct the jury that other consequences of not reaching a decision in a death-penalty case dealing specifically with the penalty phase, that the defendant would receive life imprisonment. Our authority is based primarily on some Florida cases. I can cite those to you, but that basically would be our position on that.

J.A. 164-65. The trial court then gives the following charge:

Good morning, ladies and gentleman. I understand from a note handed up by way of the bailiff that apparently came from the foreman, is that you are having some difficulty in arriving at a unanimous decision. I intend to give you a little further instruction, and then I am going to ask you to go back to the jury room to continue for some time with your deliberations.

Now, as I told you in the beginning of the trial, you are the sole judges of the facts in the case and I am the judge of the law in this case. I am not permitted to in any fashion give you a hint as to how I feel about the verdict or how the case should be decided. That is not my decision; that is not my purpose.

It is your decision as to the appropriate sentence that should be imposed in this particular case based upon your view of the evidence as well as the application of the law; but I can say that when a matter is in dispute it isn't always easy for even two persons to agree, and when 12 men and women must agree as to a particular decision, it becomes correspondingly more difficult, but it's important that jurors reach a unanimous verdict if that may be accomplished without a juror doing violence to his or her own conscience.

At the same time no juror is expected to give up an opinion based on reasoning satisfactory to himself or herself merely for the purpose of being in agreement with others.

10

It was never intended that the verdict of the jury should be the view of any one person. On the other hand, the verdict of the jury is the collective reasoning of all of the men and women serving on the panel. That's why we have a jury, so that we have the benefit of collective thought and of collective reasoning.

Now, it becomes each of your duties as jurors to tell the other jurors how you feel about the case and why you think as you do. It becomes each of your duties to exchange views with the other jurors, and you should listen to each other and give to the other's thought such meaning as you think it should have.

So, ladies and gentlemen, at this time I am going to ask you to consider that further instruction. Go back into the jury room and continue your deliberations and see if you can arrive at a unanimous verdict.

J.A. 165-166. Tucker's counsel then objects again:

Your Honor, on the specific charge and on the Allen charge in and of itself, I object to the entire charge, per se. It's the very nature of an Allen charge outside of public policy, that it helps avoid the cost of another trial which would not be applicable here.

The very nature of any sort of an Allen charge is coercive in nature. It is our position particularly at paragraph number -- the third paragraph referred to by the Court is, in effect -- it could be interpreted as singling out either one or two jurors and could lead to some coerciveness inside the deliberations.

It could be interpreted by a juror that that juror has to switch over because of a particular charge. So we would object to the charge in toto as being coercive, and just renew again our request that they be given further instruction as to the consequences of not being able to reach a unanimous verdict. That would be it.

11

J.A. 167.

- At 12:27 p.m., the jury returns a unanimous recommendation of
    death.

B.

Inasmuch as we are reviewing the dismissal by a state court of an
ineffective assistance of counsel claim, we are charged, under the
Supreme Court's mandate in Williams, supra, with determining
whether the state court's dismissal constituted an "unreasonable"
application of the Supreme Court decisions relating to ineffective
assistance of counsel. The Williams Court recently reaffirmed the
principles that guide our analysis in this regard. To establish a denial
of the right to effective assistance of counsel, Tucker must establish
two components. First, he must demonstrate that his counsel's perfor-
mance was deficient. "To establish ineffectiveness, a `defendant must
show that counsel's representation fell below an objective standard of
reasonableness.'" Williams, 120 S. Ct. at 1511 (quoting Strickland v.
Washington, 466 U.S. 668, 688 (1984)). Second, he must demonstrate
that the deficient performance prejudiced the defense. "To establish
prejudice, he `must show that there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding
would have been different.'" Williams, 120 S. Ct. at 1511-12 (quoting
Strickland, 466 U.S. at 694).

In Williams, the Supreme Court specifically rejected the notion that
the decision in Lockhart v. Fretwell, 506 U.S. 364 (1993), had modi-
fied its Strickland analysis. Specifically, the Court dismissed the idea
that we must separately inquire into fundamental fairness even if a
petitioner is able to show that his lawyer was ineffective and that the
ineffectiveness probably affected the outcome of the proceeding. Wil-
liams, 120 S. Ct. at 1513-14. In short, once the two components of the
Strickland analysis are satisfied, the inquiry ends.

C.

In Tucker's first ineffective counsel claim, he alleges that his trial
counsel was deficient in failing to object to the Allen charge on the

12

basis of a South Carolina statute that prohibits such charges under certain circumstances. In assessing this claim, we must begin with the alleged claim of error.

South Carolina has adopted a statute that governs circumstances in which an Allen charge is prohibited:

> 14-7-1330. Procedure when jury fails to agree.
>
> When a jury, after due and thorough deliberation upon any cause, returns into court without having agreed upon a verdict, the court may state anew the evidence or any part of it and explain to it anew the law applicable to the case and may send it out for further deliberation. But if it returns a second time without having agreed upon a verdict, it shall not be sent out again without its own consent unless it shall ask from the court some further explanation of the law.

S.C. Code Ann. § 14-7-1330. The import of this statute is that a trial court is prohibited from "sen[ding] out" a jury for further consideration if the jury (1) has had "due and thorough deliberations" on the questions presented, and (2) "returns a second time without having agreed upon a verdict," unless (3) the jury requests further instruction. Id.

Tucker claims that his trial counsel was ineffective in failing to object at trial on this basis. He asserts that there is a reasonable probability that the trial court would have granted his objection under section 14-7-1330. And, if the objection had been sustained, the jury's deliberations would have stopped, with the result that a sentence of life imprisonment would have been imposed.

When this claim was presented to the state PCR court, the court held that Tucker's trial counsel was not ineffective in failing to object on the basis of section 14-7-1330 because that statute did not apply to the facts surrounding the jury's deliberations. Specifically, the state PCR court concluded that, under the applicable facts, the first time that the jury returned following "due and thorough deliberation" without reaching a verdict was when the jury returned on its second day

13

of deliberations at 10:44 a.m. Thus, even assuming Tucker's trial counsel's failure to object on this basis constituted deficient performance, the state PCR court concluded that there was no reasonable probability that the objection would have been sustained.

We find no error in the state PCR court's resolution of this claim. At bottom, S.C. Code Ann. § 14-7-1330 seeks "to prevent forced verdicts, and to prevent undue severity of jury service." State v. Freely, 89 S.E. 643, 644 (S.C. 1916). Thus, courts reviewing challenges under this statute have sought to determine whether after the jury had already had "due and thorough deliberations," it was compelled to continue deliberations more than once. See, e.g., State v. Drakeford, 113 S.E. 307, 309 (S.C. 1922) (noting that both "returns" must have been "by voluntary action, actuated by, and based upon, the jury's inability to agree").

For example, the Supreme Court of South Carolina held in Drakeford, supra, that a jury's "return" to the courtroom with the stated purpose of asking for instructions "clearly indicat[ed] the jury's own opinion that there had not at that time been `due and thorough deliberation.'" Id. at 309. The guidance of Drakeford is apposite here, where the jury's first note, in which they claimed a deadlock of "10-2," also requested to rehear Tucker's testimony. In other words, in this case, the jury's "return" to the courtroom at that time was at their own insistence and was not necessarily motivated by their inability to agree. For purposes of section 14-7-1330, then, the first "return" following "due and thorough" deliberation was the jury's return on the second day of deliberation, when the jury noted it was deadlocked "11-1." Therefore, the state PCR court correctly dismissed this claim.

In any event, we certainly cannot say that the state's resolution of this claim was unreasonable, and we affirm the district court's denial thereof.

D.

In Tucker's second claim of ineffective counsel, he alleges that his counsel on direct appeal was constitutionally ineffective in raising challenges to the Allen charge that were different from the objections made at trial. The state PCR court dismissed this claim, and we must

14

thus determine whether the dismissal was unreasonable. Again, we begin with the alleged error in the trial court.

1.

At its base, Tucker's argument rests on the notion that the trial court's <u>Allen</u> charge, given during the sentencing stage of his capital case, was unduly coercive. Consistent with the rule in federal courts,**5** the Supreme Court of South Carolina has held that while "[t]he trial judge has a duty to urge the jury to reach a verdict, . . . he may not coerce it." <u>State v. Pauling</u>, 470 S.E.2d 106, 108-09 (S.C. 1996); <u>see also State v. Singleton</u>, 460 S.E.2d 573, 575-76 (S.C. 1995). South Carolina has yet to specify circumstances under which an <u>Allen</u> charge is coercive, but there are numerous decisions from the federal courts that guide our consideration Tucker's argument.

For example, the Supreme Court decision in <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988), provides some instruction. In <u>Lowenfield</u>, the jury had been given an <u>Allen</u> charge following its declaration of a deadlock and its request that the court "advise the jury as to its responsibilities." <u>Id.</u> at 234. In that circumstance, the Supreme Court recognized that the absence of one purpose underlying an <u>Allen</u> charge -- "the avoidance of the societal costs of a retrial" -- at sentencing in a death penalty case "obviously weighs[against an <u>Allen</u> charge] in the constitutional calculus, but [was not] dispositive." <u>Id.</u> at 238. In that vein, the Court found that the Government has an interest in having unanimity at the sentencing phase of a death penalty case. <u>Id.</u> However, in reviewing an <u>Allen</u> charge, reviewing courts were instructed to consider "the supplemental charge given by the trial court `in its context and under all the circumstances.'" <u>Id.</u> at 237

_____

**5** The Supreme Court has held that an <u>Allen</u> charge cannot be coercive. In <u>Jenkins v. United States</u>, 380 U.S. 445, 446 (1965) (per curiam), the Supreme Court, exercising its supervisory power over lower federal courts, reversed a conviction and remanded for a new trial where the <u>Allen</u> charge commanded: "`You have got to reach a decision in this case.'" <u>Id.</u> The Court underscored the bedrock principle underlying that decision: "[T]he principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." <u>Id.</u>

15

(quoting Jenkins v. United States, 380 U.S. 445, 446 (1965) (per curiam)). In the totality of the circumstances of Lowenfield's case, including: the fact that the instruction had been requested by the jury, that the court did not know the numerical division of the jury, and the language of the instruction, the Lowenfield Court held that the instruction in that case was not coercive.

Consistent with Lowenfield, we have noted, as a general proposition, that Allen charges will be upheld as long as they are "fair, neutral, and balanced," Carter v. Burch, 34 F.3d 257, 264 (4th Cir. 1994), and we have strongly endorsed the giving of Allen charges wherein the majority of jurors are instructed to consider the views of the jurors in the minority. United States v. Burgos, 55 F.3d 933, 937 (4th Cir. 1995) (reversing conviction and remanding for new trial based on coercive Allen charge). In Burgos, for example, the Allen charge did not request that the majority consider the minority's views, and this was one basis upon which we reversed and remanded. In addition, we identified another core problem with the Allen charge in Burgos's case -- the singling out of the minority jurors:

> Although the district court judge stated that "I'm not asking anybody to give up a firmly held belief. You don't have to do that," his very next statement was "[b]ut I do ask you to think about it." The clear implication of the court's remark is that jurors should think about giving up their firmly held beliefs. Regardless of the district court's intentions, when these three lines are read in conjunction with the court's immediately preceding remarks about pride preventing one from revisiting a position previously taken, it is reasonable to conclude that such remarks would weigh more heavily on those jurors taking a stance contrary to that of the majority of their peers.

Id. at 940. We also explained the problem with singling-out the minority jurors in the fashion in which it occurred in Burgos:

> An evaluation of a suspect Allen charge must be conducted, in part, from the perspective of a juror in the minority, because "[t]hey always know their minority status, and if fearfully inclined, may presumably suspect a disgruntled

16

judge can find them out." [United States v. Sawyers, 423 F.2d 1335, 1340 (4th Cir. 1970)]. Unlike Sawyers, in which the trial judge knew that the jury was deadlocked 10-2 in favor of a guilty verdict, id. at 1337, we have no basis for knowing how many jurors were in the minority when the foreman informed the district court that the jury was dead-locked. While no one member of a jury deadlocked at a vote of 6-6 may be particularly susceptible to the subtle coercion inherent in the court's remarks, where only one or two jurors have taken a position contrary to that of the majority, comments about "backing away from an opinion" and "pride" could be interpreted by the jury, and the dissenting jurors, in particular, as being directed at them. Nothing in the district court's charge makes it sufficiently clear that the majority and minority positions are equally credible.

Id. at 940 (emphasis added).

Similarly, the Second Circuit recently affirmed the award of a writ of habeas corpus on the basis of a coercive Allen charge. See Smalls v. Batista, 191 F.3d 272, 282-83 (2d Cir. 1999). There, the jury sent the trial court a note after four hours of deliberation that read: "`the decision is 11 to 1, and we are unable to come to a conclusion.'" Id. at 275. The trial court, over objection, then gave an Allen charge; however, in its totality, the instruction lacked "any cautionary lan-guage which would discourage jurors from surrendering their own conscientiously held beliefs." Id. at 279. In holding the charge coer-cive, the Second Circuit gave substantial weight to its potential effect on the minority jurors, noting:

The necessity for such cautionary language is highlighted in this case because, as the trial judge was well aware, the jury was divided eleven to one when the supplemental instruc-tions were given. Although the state argues that the charge was proper because the judge never singled out either the minority or the majority, it is from the position of a minority juror that a suspect Allen charge is analyzed. See United States v. Burgos, 55 F.3d 933, 940 (4th Cir.1995) ("[Minority jurors] always know their minority status, and if fearfully inclined, may presumably suspect a disgruntled

17

judge can find them out.") (citation and internal quotation marks omitted). Here, the juror in the minority was not made aware of the possibility that, if he or she was not convinced by the views of the majority, he or she should hold on to his or her own conscientiously held beliefs. The absence of that option might lead minority jurors to believe that unless they are able to convince the majority, they should abandon their own conscientiously held position.

191 F.3d at 280-81.

From these authorities, we can glean some of the relevant considerations in reviewing an <u>Allen</u> charge for coerciveness: the charge in its entirety and in context; suggestions or threats that the jury would be kept until unanimity is reached; suggestions or commands that the jury must agree; indications that the trial court knew the numerical division of the jury; indications that the charge was directed at the minority; the length of deliberations following the charge; the total length of deliberations; whether the jury requested additional instruction; and other indications of coercion.

Applying these factors here, we must agree with Tucker that the <u>Allen</u> charge given in the penalty phase of his trial was coercive. Among other things, the trial court in Tucker's case knew how the jury was divided. During the first day of deliberations, the jury notified the trial court of how it stood -- divided ten to two in favor of the death penalty. The trial court neither informed the parties that it had been so informed (it could have advised the parties and counsel of the fact that the vote had been revealed without revealing the precise vote), nor advised the jury not to reveal its vote. <u>See Burton v. United States</u>, 196 U.S. 283, 307-08 (1905) (condemning trial court knowledge of jury voting and noting: "Cases may easily be imagined where a practice of this kind might lead to improper influences, and for this reason it ought not to obtain."); <u>Brasfield v. United States</u>, 272 U.S. 448, 449-50 (1926) (same). Then, the jury revealed its vote a second time -- that it was deadlocked eleven to one in favor of the death penalty; again, the court did not reveal that it knew the precise voting. Thus, when the trial court gave the <u>Allen</u> charge, the trial court knew that there was a single hold-out to unanimity, and presumably,

18

the entire jury was aware that the trial court knew as much, but neither the State nor Tucker was so aware.

In this context, the trial court gave the Allen charge to the jury, including the following instruction: "It was never intended that the verdict of the jury should be the view of any one person." J.A. 166. The charge singled out the minority juror and emphasized the need for unanimity, without instructing that one, lone holdout was permitted under the law. The court then explained: "On the other hand, the verdict of the jury is the collective reasoning of all of the men and women serving on the panel. That's why we have a jury, so that we have the benefit of collective thought and of collective reasoning." Id. This emphasis on the collective, at the expense of the individual determination, was, in the context in which this charge was given, unduly coercive.

Although the trial court in this case qualified its charge with: "At the same time no juror is expected to give up an opinion based on reasoning satisfactory to himself or herself merely for the purpose of being in agreement with others," id., this line did not sufficiently balance the charge. This instruction merely gave one reason why a juror may decline to change his vote, and in the circumstances in which it was administered, the overall charge sought to eliminate the possibility of a single holdout juror preventing a unanimous verdict: "It was never intended that the verdict of the jury should be the view of any one person."

There are other considerations that weigh in favor of a finding of coerciveness here. First, the length of jury deliberation, in the context of the total length of deliberations, is indicative of a coercive charge. That is, the jury deliberated for a little more than one-and-a-half hours following the Allen charge (out of ten and one half hours of total deliberations), before unanimously recommending death. Notably, the lone minority juror had presumably been holding out since 5:00 p.m. the previous day, and the juror had thus been holding out for at least five hours (if not the entire period of deliberations). Yet, the juror changed his or her mind within an hour and a half of the Allen charge. Further, the jury note -- "We are hopelessly deadlocked at 11-1 for the death penalty. I do not feel we will ever get a unanimous decision" (J.A. 178) -- is telling because (1) the expression of deadlock

19

was emphatic and unequivocal; and (2) the note did not request further instruction. These facts provide further evidence that the Allen charge was coercive.

In short, the trial court: (1) with knowledge that a single juror was holding out against the death penalty; (2) gave an unbalanced Allen charge; (3) at the sentencing stage of a capital trial (where the state's interests in unanimity are less weighty than at the guilt phase); (4) to a jury that had expressed an unequivocal deadlock and had not requested further instruction; (5) after which there was a relatively short period of deliberation; (6) before the lone holdout acceded and a unanimous verdict was returned. These facts notwithstanding, there is persuasive authority for the State's contention that this was not a coercive Allen charge.[6] Thus, even with the 20-20 hindsight of appellate review, we must concede that this is a close issue. Nonetheless, with the benefit of that hindsight and in the totality of the circumstances, we are constrained to conclude that this Allen charge was coercive. Put simply, the import of the charge was that the single juror (whom every member of the jury knew was holding out) should not prevent the majority from imposing the death penalty.

_____

[6] **See Lowenfield**, supra (Allen charge found not to be coercive;however, trial court did not know the votes of the jurors, and instruction was not addressed to minority jurors); Green v. French, 143 F.3d 865, 885-90 (4th Cir. 1998) (same).

Similarly, in United States v. Sawyers, 423 F.2d 1335, 1339 (4th Cir. 1970), this court upheld a conviction following an Allen charge, and in that case, the trial court knew how the jury vote stood when it gave the charge. The trial court responded to a division of 10-2 with an extended Allen charge that admonished the jury to try to reach unanimity; however, the charge in Sawyers also included at least three separate commands that jurors not give up firmly held views. In this context, we concluded that the charge was not coercive. The Sawyers decision is, of course, distinguishable, not only because Allen charge in that case repeatedly admonished the members of the jury not to give up firmly held beliefs, but also because that charge did not single out the dissenting jurors.

20

2.

Establishing an error in the state court proceedings, however, is quite different than demonstrating an entitlement to federal habeas corpus relief. Indeed, this case presents a textbook example of the effect of AEDPA on our review of a state court decision. That is, Tucker must satisfy two further steps before he is entitled to federal habeas corpus relief: (1) that he was deprived of a federally guaranteed right, and (2) that the state PCR court's adjudication of his claim was unreasonable. On these two steps, Tucker's claim fails.

a.

A defendant is constitutionally entitled to effective assistance of counsel on direct appeal, see Evitts v. Lucey , 469 U.S. 387, 396 (1985), and the standards governing effectiveness at trial are equally applicable to representation on direct appeal. See Smith v. South Carolina, 882 F.2d 895, 898 (4th Cir. 1989) (citing Strickland, supra).

At trial, Tucker's counsel raised several objections to the Allen charge. First, before the charge was administered, trial counsel requested: (1) that the jury should be asked whether "they are hopelessly deadlocked" before an Allen charge was to be given; and (2) that the jury be instructed that Tucker would receive life imprisonment if a unanimous recommendation of death were not returned. These requests were rejected, and following the charge, trial counsel made several other objections: (3) "I object to the entire charge, per se. It's the very nature of an Allen charge outside of public policy, that it helps avoid the cost of another trial which would not be applicable here"; (4) "It is our position particularly at paragraph number -- the third paragraph referred to by the Court is, in effect -- it could be interpreted as singling out either one or two jurors and could lead to some coerciveness inside the deliberations. It could be interpreted by a juror that juror has to switch over because of a particular charge. So we would object to the charge in toto as being coercive"; and (5) I "renew again our request that they be given further instruction as to the consequences of not being able to reach a unanimous verdict." J.A. 167. All of these objections were overruled.

On direct appeal, Tucker was represented by a different lawyer, who challenged the Allen charge on several grounds. The Supreme

21

Court of South Carolina rejected each argument on the grounds of procedural default:

> The trial judge then gave the jury an <u>Allen</u> charge. [Tucker's trial counsel] objected generally on the ground an <u>Allen</u> charge is coercive in nature and requested an instruction as to the consequences of not being able to reach a unanimous decision for the death penalty (<u>i.e.</u> the defendant would be sentenced to life).
>
> On appeal, appellant argues the trial judge should have told the jury not to reveal their vote pursuant to <u>State v. Middleton</u>, 218 S.C. 452, 63 S.E.2d 163 (1951) (it is improper for trial judge to make the jury publicly reveal their standing). Further, on appeal appellant contends the trial judge, knowing only one juror prevented the jury from a unanimous decision, erred in giving an <u>Allen</u> charge. These arguments are procedurally barred. <u>State v. Bailey</u>, 298 S.C. 1, 377 S.E.2d 581 (1989) (a party cannot argue one ground below and then argue another ground on appeal); <u>State v. Crowley</u>, 226 S.C. 472, 85 S.E.2d 714 (1955) (objection must be on specific ground).

<u>Tucker</u>, 462 S.E.2d at 264-65.

Put simply, we are unable to discern how the Supreme Court of South Carolina could have concluded that Tucker's direct appeal counsel procedurally defaulted these arguments. Indeed, when trial counsel's objections are compared to the arguments summarized in the Supreme Court's opinion, the trial objections and arguments on appeal appear to be virtually identical. Tucker's argument on direct appeal that "the trial judge, knowing only one juror prevented the jury from a unanimous decision, erred in giving an Allen charge" is consistent with his trial counsel's objection that the <u>Allen</u> charge "could be interpreted as singling out either one or two jurors and could lead to some coerciveness inside the deliberations. It could be interpreted by a juror that juror has to switch over because of a particular charge." This is especially so because Tucker's trial counsel <u>did not know that the trial court knew the jury's vote at that point</u>. In this regard, Tucker's appellate counsel's argument that"the trial judge

22

should have told the jury not to reveal their vote pursuant to State v. Middleton" could not have been preserved at trial for this reason. In context, it is unclear what more could have been done -- either by trial counsel or direct appeal counsel -- to preserve these arguments.

Faced with these facts, the state PCR court was similarly unable to find any deficiency in the performance of Tucker's direct appeal counsel: "This Court must find that [Tucker's direct appeal counsel] met the standards required of appellate counsel in criminal cases." J.A. 323. We agree; in fact, if there was any error in this regard, it was the conclusion of the Supreme Court of South Carolina that Tucker's arguments were procedurally defaulted. We thus agree with Chief Justice Finney, who dissented from the decision of the Supreme Court of South Carolina:

> I am also concerned with the majority's disposition of the claim that the trial judge should have instructed the jury not to reveal its vote and that the judge erred in giving an Allen charge knowing only one juror opposed the death sentence. While I agree that these issues were not raised below, it is apparent from this record that the trial judge never revealed to trial counsel that the notes reflected the jury's division.

462 S.E.2d at 266.

For Tucker, however, our analysis means that the performance of his counsel on direct appeal was not deficient. Tucker's counsel apparently did all that effective counsel could have been expected to do under the circumstances. In sum, we find no error in the conclusion of the state PCR court that the performance of Tucker's direct appeal counsel was effective, and we certainly do not believe that the State's conclusion is "unreasonable" in the Williams sense.

b.

Further, even if the conduct of Tucker's counsel had been deficient, we could not conclude that the state PCR court unreasonably rejected Tucker's claim. While we have concluded that the state PCR court was incorrect in finding that the Allen charge was not coercive, we

23

believe this to be a close issue. See supra at 20. In other words, an objectively reasonable review could have concluded that there was no reasonable probability of success on the Allen charge arguments. Therefore, we cannot conclude that the state PCR court's dismissal of this claim was unreasonable. See Barnabei v. Angelone, No. 99-16, at 10 (4th Cir. Jun. 5, 2000) (To justify federal habeas corpus relief under section 2254(d), "the state court's application of federal law . . . must have been more than merely `incorrect' in the estimation of the federal habeas court.") (quoting Williams, 120 S. Ct. at 1521-22).

For these reasons, we affirm the dismissal of Tucker's claim of ineffective assistance of counsel on direct appeal.

V.

Tucker also raises two other arguments in this appeal; however, for the reasons set forth below, we conclude that these claims were properly dismissed.

A.

Tucker contends that the denial of his request for an instruction relating to his parole eligibility was error. Tucker presented this claim in his application for post-conviction relief in state court, but he did not appeal its dismissal to the Supreme Court of South Carolina. Tucker claims that his procedural default is excused by "cause" and "prejudice," in that his state PCR counsel were ineffective in failing to pursue this claim.

We disagree. Tucker's claim fails because, among other things, there was no reasonable probability that this argument would have been successful. Had the trial court sustained Tucker's objection at trial, all he would have been entitled to was a jury instruction. However, the trial court properly instructed the jury that: "Whether or not the defendant would or would not be eligible for parole should not enter into your deliberations or factor into your decision. The terms a death sentence and a life imprisonment sentence are to be understood in their plain and ordinary meaning." J.A. 159-60. In this light, Tucker can demonstrate no prejudice. See Young v. Catoe, 205 F.3d

24

750, 764 (4th Cir. 2000) (finding instruction that "the terms `life imprisonment' and `death sentence' should be understood in their ordinary and plain meaning" was sufficient to cure juror confusion about parole eligibility).

B.

Second, Tucker claims that his trial counsel was constitutionally ineffective in failing to "develop and submit" mitigating evidence: to wit, that Tucker's drug and alcohol use was a mitigating circumstance that should have been considered by the jury. Tucker's PCR counsel did not appeal the State's dismissal of this claim to the state supreme court, and South Carolina thus argues that this argument has been pro-cedurally defaulted for failure to exhaust state remedies.

Again, Tucker responds that this procedural default should be excused for cause and prejudice: that Tucker's PCR counsel was inef-fective in failing to appeal the denial of this claim to the Supreme Court of South Carolina. However, among other things, there was no likelihood that the Supreme Court of South Carolina would hold that Tucker's counsel was ineffective in failing to "develop and submit" mitigation evidence on this issue. We conclude that Tucker's coun-sel's approach to this evidence constituted a reasonable trial strategy, and we decline to grant the writ on this basis.

VI.

For the reasons set forth above, we find no reversible error, and we affirm the dismissal of Tucker's petition for a writ of habeas corpus.

AFFIRMED

25