JOURNAL ENTRY and OPINION
{¶ 1} Appellant Larry Solomon appeals his conviction and sentence after a jury trial. On appeal, Solomon assign the following errors for our review:
"I. The trial court erred by granting the State's motion to join allthree indictments in one trial which resulted in prejudice toappellant."
 "II. The trial court erred to the prejudice of appellant in overrulingthe defendant-appellant's motion to suppress identification testimony andphotographic evidence.
 "III. Appellant's convictions were not supported by sufficient evidenceand the trial court erred by denying his motion for acquittal in eachcase."
 "IV. The convictions were against the manifest weight of theevidence."
 "V. The trial court's imposition of consecutive sentences was notsupported by clear and convincing evidence, was contrary to law andviolated appellant's Sixth Amendment right to have sentence enhancingfacts determined by a jury."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} The Cuyahoga County Grand Jury indicted Solomon in three separate cases. In the first two cases, the grand jury indicted Solomon for aggravated robbery and robbery. In the third case, Solomon was indicted for two counts of robbery with notice of prior conviction and repeat violent offender specifications.
 {¶ 4} The charges against Solomon arose from three separate incidents of purse-snatchings in the downtown area of Cleveland. The first incident occurred on December 4, 2003. Emily Bayer left work and was walking to her car, which was parked three blocks away from her job. As she walked, Bayer passed a man on the street, made eye contact, and proceeded on her way. As she turned into the parking lot, the man came up behind her and struggled with her. Bayer stumbled backwards, but caught her balance and did not fall. The man grabbed her purse and fled in the opposite direction. After the encounter, which lasted about thirty seconds, Bayer made a police report and gave a description of the assailant as a tall, thin, black male, with large distinctive eyes. From a photographic array and also at trial, Bayer identified Solomon as the thief.
 {¶ 5} The second incident occurred on December 16, 2003. On that date, Blair Barnhart had just left work and was walking to her car, when a man on a bicycle approached. The man asked for directions. While Barnhart directed him, the man turned, faced her, and asked if he could leave his bicycle in the parking lot. At some point during their encounter, Barnhart lost consciousness, regained it, and endured the man stomping repeatedly on her chest and neck. Barnhart released her purse to the assailant, who got on his bicycle and fled. Barnhart yelled at the assailant, who mockingly turned to look at her. After the incident, Barnhart described her assailant to the police as a tall, thin, black male, with large eyes. From a photographic array and also at trial, Barnhart identified Solomon as the thief.
 {¶ 6} The third incident occurred on December 21, 2003. Melanie Salyer and her mother, Brenda Salyer, went to see the Trans Siberian Orchestra at the CSU Convocation Center. After the show, the Salyers walked to the parking garage adjacent to the CSU Convocation Center. While they waited for the elevator, a man approached and made a remark about the elevator. The Salyers decided to take the stairs; and the man followed them. As the Salyers reached their car, the man lunged at Brenda Salyer, took her purse, and fled. In an attempt to recover her mother's purse, Melanie Salyer pursued the assailant. The assailant turned around, came back, struggled to also get her purse, but gave up and fled. In reporting the incident to the police, the Salyers described their assailant as a tall, thin, black male, with large eyes. After separately being shown photographic arrays, the Salyers identified Solomon as their assailant.
 {¶ 7} At his arraignment, Solomon pled not guilty to the indictments and subsequently filed motions to suppress the identification, which the trial court denied. The State filed motions for joinder of the three cases, which the trial court granted.
 {¶ 8} Thereafter, the matter proceeded to trial. All four victims testified about their separate attacks; all four identified Solomon as their assailant. At the conclusion of the trial, the jury returned guilty verdicts on all charges. The trial court sentenced Solomon to three consecutive prison terms of incarceration totaling twenty years. Solomon now appeals.
 JOINDER OF CASES {¶ 9} In the first assigned error, Solomon argues the trial court erred when it granted the State's motion to join all three cases. We disagree.
 {¶ 10} Crim.R. 13 allows a court to order two or more indictments tried together if the offenses could have been joined in a single indictment.[1] Crim.R. 8(A) provides:
"Joinder of offenses. Two or more offenses may be charged in the sameindictment, information or complaint in a separate count for each offenseif the offenses charged * * * are of the same or similar character, orare based on the same act or transaction, or are based on two or moreacts or transactions connected together or constituting parts of a commonscheme or plan, or are part of a course of criminal conduct."
 {¶ 11} Generally, the law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character.[2] Joinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses, and minimizing the possibility of incongruous results in successive trials before different juries.[3]
 {¶ 12} However, if joinder would prejudice a defendant, the trial court is required to order separate trials.[4] It is the defendant who bears the burden of demonstrating prejudice and that the trial court abused its discretion in denying severance.[5]
 {¶ 13} The prosecutor may counter the claim of prejudice in two ways.[6] The first is the "other acts" test, where the State can argue that it could have introduced evidence of one offense in the trial of the other severed offense under the "other acts" portion of Evid.R. 404(B).[7] The second is the "joinder" test, where the state is merely required to show that evidence of each of the crimes joined at trial is simple and direct.[8] If the state can meet the "joinder" test, it need not meet the stricter "other acts" test.[9] Thus, an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B).[10]
 {¶ 14} Here, there were three cases joined for trial. Each case involved unsuspecting women, who were attacked in the evening or at night. Each time Solomon attempted to communicate with the victim. The record reveals Solomon made eye contact with Bayer, and engaged Barnhart and the Salyers in brief conversations. Each time, Solomon attacked the victim before, during, and/or after the theft attempt. Each incident occurred in the downtown area of Cleveland, and all three incidents happened within a two week period. Therefore, we find that joinder was proper because the crimes were of the same or similar character. Accordingly, we overrule Solomon's first assigned error.
 MOTION TO SUPPRESS {¶ 15} In the second assigned error, Solomon argues the trial court erred in overruling his motion to suppress identification testimony and photographic evidence. We disagree.
 {¶ 16} Generally, identification testimony is properly admitted unless the identification procedure was so impermissibly suggestive that there was a substantial likelihood of irreparable misidenti-fication.[11] The court must consider the totality of the circumstances surrounding the identification.[12] In Neil v. Biggers,[13] the United States Supreme Court set forth the following factors to be considered in examining an identification procedure and its impact:
"* * * Whether under the `totality of the circumstances' theidentification was reliable even though the confrontation procedure wassuggestive. As indicated by our cases, the factors to be considered inevaluating the likelihood of misidentification include the opportunity ofthe witness to view the criminal at the time of the crime, the witness'degree of attention, the accuracy of the witness' prior description ofthe criminal, the level of certainty demonstrated by the witness at theconfrontation, and the length of time between the crime and theconfrontation. * * *"[14]
 {¶ 17} Before the out-of-court identification testimony is suppressed, the trial court must find that the procedure employed was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.[15] Moreover, although the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the identification.[16] Thus, although the identification procedure is suggestive, as long as the challenged identification itself is reliable, it is admissible.[17]
 {¶ 18} Where a suspect has been confronted by a witness before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances.[18] The required inquiry is, there-fore, two-pronged, with the first question to be asked being whether the initial identification procedure was unnecessarily or unduly suggestive. Merely because a specific procedure is unnecessarily suggestive does not per se render the challenged identification inadmissible.[19] The focus then shifts to reli-ability, i.e., whether the out-of-court suggestive procedure created a very substantial likelihood of misidentification.[20]
 {¶ 19} In the instant case, Detective Dale Moran, of the Cleveland Police Department, testified that he prepared several photographic arrays for the victims to view. Each victim identified Solomon as their assailant. When he met with mother and daughter, Brenda and Melanie Salyers, they viewed the photographic arrays separately and apart from each other. Detective Moran showed Brenda Salyers all the arrays and she did not identify Solomon until the second page. Melanie Salyers identified Solomon in two separate arrays.
 {¶ 20} Additionally, when Detective Moran met with Blair Barnhart, she identified Solomon in the first photographic array. Further, when he met with Emily Bayer, Detective Moran showed her individual Polaroids and also photographic arrays. Bayer identified Solomon from the Polaroids.
 {¶ 21} Finally, in examining the Biggers analysis, all four victims testified regarding their encounter and identification of Solomon.
 {¶ 22} The first victim, Emily Bayer, testified in pertinent part as follows:
"Like I said before, I remember passing him. I looked at him and thenwhen he did come up from behind me, while I was falling back, I caught mybalance. Then we were facing each other."[21]
 {¶ 23} Further in regards to the identification of Solomon, Bayer testified as follows:
"Q. And, you viewed that photo array or photo spread with DetectiveMoran?
 A. Yes.
 Q. And, how did he present that to you?
 A. He first showed me six Polaroids. And, I looked through those anddidn't find him. And so then he showed me the line-up and I picked himout.
 Q. And, how long did it take you to pick him out after lookingat the exhibit?
 A. I viewed it and said, that's him."[22]
 {¶ 24} Blair Barnhart testified as follows about her encounter with Solomon:
"So then he put the kickstand down on his bike, walked towards me and Isaid, why don't I show you — I don't remember exactly what I said, but Iwalked with him, while we were looking at each other, towards the door,towards that entrance. He said, then turned around, faced me, and said,may I leave my bike here?
 " * * *
 "So, as I was laying there, I'm thinking, this man's going to kill me,because he kept stomping on my neck. And I'm staring at him thinking,what are you doing?"[23]
 {¶ 25} Further in regards to the identification of Solomon, Barnhart testified as follows:
"Q. Tell us how that procedure took place as far as him — when hepresented the photos, did he present a lot of photos to you? Did hepresent —
 "A. From what I remember, he presented a page with six photographs onit. And, I looked at the photos; immediately chose my assailant."[24]
 {¶ 26} Brenda Sayler testified as follows about her encounter with Solomon:
"A. My daughter pressed the elevator button and nothing happened. So,she pressed it again and then all of a sudden this person appears that Ihad not seen come up. And he said, sometimes these don't work. You haveto do this. And, he put his hands on the elevator and acted like he wastrying to open the door. So I said, I motioned to my daughter, let's goup the stairs.
 So, we started up the stairs. I went first. She went second and then hecame afterwards. And, he walked beside me the whole way across theparking floor there. And I said — well, my daughter went to thepassenger's side and I said to him, we're just trying to get back toAkron. And he was still walking beside me and I just thought he wanted aride or something. I didn't really know what he wanted. But he got realbelligerent and said, what? What? And, he snatched my purse.
 "Q. Okay.
 "A. And so then my daughter — well, then I said, here take thisinstead. And, I threw my bag of souvenirs at him, hoping he drop mypurse, which he did. But then he picked it back up again. But, I lungedfor it at the same time. We were kind of pulling and he got it off. Andmy daughter said something like, no, wait or give that back orsomething. But, she started to run after him. And, he turned around andsaid, I'll just take yours, too. And, she had her purse, which was like abackpack or book bag, almost around her neck. And, he's pushing her headdown and yanking her purse and pulling her."[25]
 {¶ 27} Further in regards to the identification of Solomon, Brenda Sayler testified as follows:
"Q. And when you met with the detective, did you have an opportunity toview some photos?
 "A. Yes.
 Q. How many photos do you remember viewing?
 "A. I'm going to say twelve. Four pages. They were unbound. They wereloose. So, I saw the picture of the gentleman that had taken my purse, onthe second page. I just quit looking after that.
 "Q. You had actually looked at one sheet —
 "A. Correct. Looked at the top row and he was in the second row."[26]
 {¶ 28} Melanie Salyer's version of the encounter with Solomon was the same as her mother's. Melanie Salyers immediately identified Solomon as her assailant when she was shown the photographic array. Further, she stated "I distinctly remember his face. He was right in front of me and his eyes stood out the most. But, I'll never forget his face."[27]
 {¶ 29} A review of the above testimonies reveal that each victim had ample opportunity to view Solomon at the time he attacked them. They all testified that they were able to look directly at his face. Barnhart testified that she stared at Solomon while he was stomping on her chest and neck. The Salyers testified Solomon stood with them at the elevator, then walked beside them from the elevator, up the stairs, and to their car. Bayer, despite only a thirty second encounter, made eye contact with Solomon as she passed him, and looked directly at him while they struggled for her purse.
 {¶ 30} In addition, all four victims testified that Solomon was a tall, thin, black male, with large distinctive eyes. Further, all four victims demonstrated a high level of certainty that Solomon was the person who robbed them. All four victims immediately selected Solomon from the photographic arrays, and unequivocally identified him in court. Finally, all four victims identified Solomon within one to two months after their attacks, thus, they were able to identify him before their memories faded.
 {¶ 31} We conclude that nothing in the record suggests an impermissible identification procedure. Thus, the certainty of identification was proven beyond any reasonable doubt. Accordingly, we overrule Solomon's second assigned error.
 SUFFICIENCY OF EVIDENCE {¶ 32} In his third assigned error, Solomon argues his convictions were not supported by sufficient evidence. We disagree.
 {¶ 33} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the State met its burden of production at trial.[28] On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.[29] In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution.[30]
 {¶ 34} In the case at bar, the State presented sufficient evidence on the charges of aggravated robbery and robbery. For each separate crime, the State presented evidence from the victims that their purses were stolen by force. Bayer testified Solomon came up behind her, struggled with her, took her purse, and fled. Barnhart remembered losing consciousness and upon regaining it, saw Solomon stomping on her chest and neck. Barnhart, ultimately relinquished her purse to Solomon. Brenda and Melanie Sayler testified Solomon followed them from the elevator, up the stairs, and to their car. Thereafter, Solomon snatched Brenda's purse and fled. When pursued by her daughter, Melanie, Solomon turned and struggled with her in an attempt to also get her purse. Thus, the State presented sufficient evidence that Solomon committed the crimes in question. Accordingly, we overrule Solomon's third assigned error.
 MANIFEST WEIGHT {¶ 35} In the fourth assigned error, Solomon argues his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 36} Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of evidence.[31]
 {¶ 37} When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[32] The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against the conviction.[33]
 {¶ 38} Stated succinctly, a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt.[34]
 {¶ 39} In the case at bar, the jury did not lose its way and create a manifest miscarriage of justice. The State presented four victims who unequivocally identified Solomon as their assailant. At trial, one of the victims, Blair Barnhart, was asked how positive she was that Solomon was her assailant, and she stated the following:
"because we had a conversation for 3 to 5 minutes, I don't know howlong it was, but we were having this conversation as he got off hisbike, when we stood talking to one another as I was walking him towardsthe building and then again facing each other. So, I had what I felt wasa fairly good opportunity to take a good look at him throughout thetime, because I believe he was a client. I was trying to be respectful,just looking him in the eye and speaking with him."[35]
 {¶ 40} Another victim, Melanie Sayler, stated the following:
"I distinctly remember his face. He was right in front of me and hiseyes stood out the most. But, I'll never forget his face."[36]
 {¶ 41} A review of the record indicates the aforementioned victims' identification testimony overwhelmingly supports Solomon's conviction.[37] As a result of our review of the record, we conclude the jury herein did not lose its way and create a manifest miscarriage of justice by finding Solomon guilty of aggravated robbery and robbery. Accordingly, we overrule Solomon's fourth assigned error.
 CONSECUTIVE SENTENCES {¶ 42} In the fifth assigned error, Solomon argues that the trial court's imposition of consecutive sentences was not supported by clear and convincing evidence, was contrary to law and violated his Sixth Amendment rights to have sentence enhancing facts determined by a jury. We disagree.
 {¶ 43} In the first case, the trial court sentenced Solomon to a prison term of six years for the robbery of Emily Bayer. In the second case, the trial court sentenced Solomon to eight years for the aggravated robbery against Blair Barnhart. Finally, in the third case, the trial court sentenced Solomon to two six-year concurrent prison terms for the robbery of Brenda and Melanie Salyers. However, the sentences in the three separate cases were to be served consecutively to each other for a total term of incarceration of twenty years.
 {¶ 44} The law is well settled that we will not reverse a trial court on sentencing issues unless the defendant shows by clear and convincing evidence that the trial court has erred.[38]
 {¶ 45} R.C. 2929.14(E)(4) states:
"If multiple prison terms are imposed on an offender for convictions ofmultiple offenses, the court may require the offender to serve the prisonterms consecutively if the court finds that the consecutive service isnecessary to protect the public from future crime or to punish theoffender and that consecutive sentences are not disproportionate to theseriousness of the offender's conduct and to the danger the offenderposes to the public, and if the court also finds any of the following:
 "(a) The offender committed one or more of the multiple offenses whilethe offender was awaiting trial or sentencing, was under a sanctionimposed pursuant to section 2929.16, 2929.17, or 2929.18 of the RevisedCode, or was under post-release control for a prior offense.
 "(b) At least two of the multiple offenses were committed as part ofone or more courses of conduct, and the harm caused by two or more of themultiple offenses so committed was so great or unusual that no singleprison term for any of the offenses committed as part of any of thecourses of conduct adequately reflects the seriousness of the offender'sconduct.
 "(c) The offender's history of criminal conduct demonstrates thatconsecutive sentences are necessary to protect the public from futurecrime by the offender."
 {¶ 46} In order to impose consecutive sentences, a trial court must make the statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing.[39] In this case, the trial court set forth its reasons and findings for imposing consecutive sentences as follows:
"The Court: Court has to make a finding, because of the consecutiveterms that it just imposed, Court finds that it's necessary to protectthe public, punish the offender, it's not disproportionate to hisconduct, and all three categories apply; number one, the crimes werecommitted while he was on parole; number two, the harm was so great andunusual that a single term does not adequately reflect the seriousness ofhis conduct. I point to the multiple victims and the statements that weheard from them, and my comments apply to each one of them. Theoffender's criminal history shows that consecutive terms are needed toprotect the public. I went through a litany of prior crimes committed bythe defendant to support that category. I will incorporate my priorcomments into the consecutive terms language that is required bystatute."[40]
 {¶ 47} Prior to setting forth its reasons and findings for imposing consecutive sentences, the trial court made the following observations:
"Defendant was on parole while he committed these crimes. He has ahistory of criminal convictions; prior robbery, prior drug abuse, priorrobbery, prior theft, prior carrying a concealed weapon, prior assault,prior criminal trespass. And he has obviously not responded favorably tosanctions previously imposed, even though he has done prior time inprison."[41]
 {¶ 48} We have carefully reviewed the record and find that there is clear and convincing evidence to support the trial court's determination. We find that Solomon was properly sentenced to consecutive sentences and that the court sufficiently gave its reasons and findings pursuant to R.C. 2929.14.
 BLAKELY {¶ 49} Nonetheless, Solomon also contends that his sentence violates his constitutional right to have all sentencing enhancing facts determined by a jury. Specifically, Solomon contends that his consecutive sentence violates the U.S. Supreme Court's decision in Blakely v.Washington.[42] However, this issue has been addressed in this court's en banc decision of State v. Lett.[43] In Lett, we held that R.C.2929.14(C) and (E), which govern the imposition of maximum and consecutive sentences, do not implicate the Sixth Amendment as construed in Blakely. Accordingly, in conformity with that opinion, we reject Solomon's contentions and overrule his fifth assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., J., and Calabrese, Jr., J., concur.
[1] See also R.C. 2941.04.
[2] State v. Lott (1990), 51 Ohio St.3d 160, 163.
[3] State v. Torres (1981), 66 Ohio St.2d 340.
[4] Crim.R. 14.
[5] State v. Hill, Cuyahoga App. No. 80582, 2002-Ohio-4585, citingState v. Coley, 93 Ohio St.3d 253, 2001-Ohio-1340.
[6] State v. Franklin (1991), 62 Ohio St.3d 118, 122, citing Lott,
supra.
[7] Id.
[8] Id., see, also, State v. Roberts (1980), 62 Ohio St.2d 170, 175.
[9] Id.
[10] Id.; See, also, State v. Brinkley, 105 Ohio St.3d 231, 236,2005-Ohio-1507.
[11] See Simmons v. United States (1968), 390 U.S. 377, 88 S.Ct. 967,19 L. Ed.2d 1247; State v. Barnett (1990), 67 Ohio App.3d 760; Statev. Hill (1987), 37 Ohio App.3d 10.
[12] See Stovall v. Denno (1967), 388 U.S. 293, 87 S.Ct. 1967,18 L.Ed.2d 1199; Foster v. California (1969), 394 U.S. 440, 89 S.Ct. 1127,22 L. Ed.2d 402; United States v. Burgos (C.A.4, 1995), 55 F.3d 933;State v. Fanning (1982), 1 Ohio St.3d at 20, citing State v. Jackson
(1971), 26 Ohio St.2d 74, paragraph two of the syllabus.
[13] Neil v. Biggers (1972), 409 U.S. 188, 199-200, 93 S.Ct. 375, 382,34 L.Ed.2d 401.
[14] See, also, State v. Jells (1990), 53 Ohio St.3d 22, 27.
[15] See Barnett, supra. See, also, State v. Hill,37 Ohio App.3d at 14; State v. Blackwell (1984), 16 Ohio App.3d 100.
[16] See State v. Merrill (1984), 22 Ohio App.3d 119, 121;State v. Moody (1978) 55 Ohio St.2d 64, 67.
[17] See Manson v. Brathwaite (1977), 432 U.S. 98, 97 S.Ct. 2243,53 L.Ed.2d 140; Moody, supra.
[18] See State v. Brown (1988), 38 Ohio St.3d 305, 310.
[19] See Manson, supra, and Moody, supra; Merrill, supra.
[20] See Simmons v. United States (1968), 390 U.S. 377, 88 S.Ct. 967,19 L.Ed.2d 1247.
[21] Tr. at 274.
[22] Tr. 278-279.
[23] Tr. at 315.
[24] Tr. at 320.
[25] Tr. at 351-352.
[26] Tr. at 358.
[27] Tr. at 398.
[28] State v. Thompkins (1997), 78 Ohio St.3d 380.
[29] Id.; State v. Fryer (1993), 90 Ohio App.3d 37.
[30] Id. at 43.
[31] State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
[32] State v. Martin (1983), 20 Ohio App.3d 172,175, citing Tibbs v.Florida (1982), 457 U.S. 31, 38, 42. See, also, State v. Thomkins
(1997), 78 Ohio St.3d 380.
[33] Martin, citing Tibbs. See, also, State v. Thomkins (1997),78 Ohio St.3d 380.
[34] State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[35] Tr. at 330.
[36] Tr. at 398.
[37] State v. Artis (May 17, 1994), 10th Dist. No. 93APA11-1547; Statev. Douglas (Sept. 22, 1994), Cuyahoga App. No. 65779.
[38] State v. Douse, Cuyahoga App. No. 82008, 2003-Ohio-5238, citing R.C. 2953.08(G).
[39] State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus; see, also, State v. Lett, 161 Ohio App.3d 274,2005-Ohio-2655.
[40] Sentencing Transcript at 35.
[41] Sentencing Transcript at 31.
[42] Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403.
[43] 161 Ohio App.3d 274, 2005-Ohio-2665.